[Crim. No. 475. Second Appellate District.—April 16, 1917.]

THE PEOPLE, Respondent, v. M. A. SCHMIDT, Appellant.

CRIMINAL LAW—QUASHING OF INDICTMENT—AMENDMENT OF CODE—APPLICABILITY TO MOTION.—The amendment of 1911 to section 995 of the Penal Code which took away the defendant's right on motion to set aside an indictment to urge any objection to grand jurors which would be good on challenge to the trial jury, either as to the panel or an individual juror, related to procedure, and its applicability to a motion made to quash an indictment filed after the amendment became effective accusing a defendant with the com-

mission of a crime prior to the amendment does not deprive the defendant of any of his substantial rights.

ID.—EX POST FACTO LAW—TIME.—The time important to be taken into consideration in determining whether a law is *ex post facto* or not is the time and the state of the law at which the alleged offense was committed.

ID.—MOTION TO QUASH INDICTMENT—SUFFICIENCY OF EVIDENCE—MODE OF EXAMINATION OF WITNESSES BY GRAND JURY.—A defendant on a motion to quash an indictment can only urge such grounds as are permitted him by section 995 of the Penal Code, and furthermore no inquiry can be made as to the sufficiency of the evidence or the mode of examining witnesses before the grand jury.

ID.—PROCEEDINGS BEFORE GRAND JURY—PRESENCE OF ALLEGED ILLE-GALLY APPOINTED DEPUTY DISTRICT ATTORNEY—MOTION TO QUASH PROPERLY DENIED.—An indictment is not subject to a motion to quash on the ground that persons other than those authorized by law were permitted to be present during the proceedings taken be-fore the grand jury, where the alleged unauthorized person was one who had been appointed a deputy district attorney after the number of deputies who are allowed compensation by the statute had been appointed.

ID.—DISTRICT ATTORNEY—APPOINTMENT OF DEPUTIES.—Under section 4230 of the Political Code, a district attorney may appoint as many deputies as he chooses, but if he appoints any in excess of those for which compensation is provided to be paid from the public treasury, he must pay such deputies at his own expense, if they are to receive compensation.

ID.—CHALLENGES TO JURORS—ACTUAL BIAS—OPINIONS FOUNDED ON RUMORS AND NEWSPAPER STATEMENTS.—In a prosecution for the crime of murder by dynamiting a building, it is not error to dis-allow challenges to jurors for actual bias, where it appeared from the answers given by them that the foundation for their opinions was public rumor, statements in public journals, and common notoriety, each declaring his ability to lay his opinion aside and consider the case against the defendant fairly and impartially.

ID.—REVERSAL FOR DISALLOWANCE OF CHALLENGES — NATURE OF EVI-DENCE.—On challenges to jurors for actual bias based on public rumor, statements in public journals, and common notoriety, in order to justify a reversal, the evidence given by the venireman upon his examination must be practically without conflict, and be so opposed to the decision of the trial court that the question becomes one of law.

ID.—CONSPIRACY—EVIDENCE.—In proving a conspiracy it is not neces-sary that proof be made that the parties met and actually agreed to undertake the performance of the unlawful act, but a conspiracy may be shown by proof of facts and circumstances sufficient to

satisfy the jury of the existence of the conspiracy, leaving the weight and sufficiency of the evidence to the triers of the questions of fact.

ID.—MURDER — DYNAMITING OF BUILDING — CONSPIRACY — EVIDENCE— ACTS AND DECLARATIONS OF CONSPIRATORS.—In a prosecution for murder by dynamiting a building, where it is shown by overwhelming proof that a conspiracy had been organized on the part of a labor union and the work thereof prosecuted to the end that at every place in the United States where the open-shop was in force it was planned to use the weapon of nitroglycerin or dynamite to intimidate those opposed to the demands of the union, it was proper to show all of the acts, declarations, and correspondence had between the persons concerned, which referred to the means and methods employed and to be employed in furtherance of the common design, notwithstanding the defendant did not take an active part in the conspiracy until some time after a series of unlawful acts had been committed in other parts of the country.

ID.—EVIDENCE — SUITCASE CONTAINING INCRIMINATING ARTICLES.—In such a prosecution a suitcase containing an alarm clock, a coil of black fuse, some blasting caps, a brass plate, some brass bars with screws, and copies of newspapers containing accounts of the destruction of the building, which was found in the checking-room at a ferry station in another city several months after such destruction, was competent evidence, where the suitcase was identified as being one seen in the possession of one of the conspirators, and the clock and brass pieces were shown to be of a similar kind to those used by such conspirators.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Frank R. Willis, Judge.

The facts are stated in the opinion of the court.

Nathan C. Coghlan, Edwin V. McKenzie, Job Harriman, J. H. Ryckman, and William F. Herron, for Appellant.

U. S. Webb, Attorney-General, Robert M. Clarke, Deputy Attorney-General, Thomas Lee Woolwine, District Attorney, and A. H. Van Cott, Deputy District Attorney, for Respondent.

JAMES, J.—Appeal from a judgment directing the imprisonment of the defendant in the state penitentiary for the period of his natural life, and also from an order denying his motion for a new trial.

The defendant was accused by an indictment of a grand jury of the county of Los Angeles, in which several other defendants were named, of having on the first day of October, 1910, feloniously and with malice aforethought murdered one Charles Hagerty. The indictment was filed on the fifth day of May, 1911. Defendant not being apprehended until the year 1915, he was then placed upon trial, which after a lengthy hearing, resulted in a verdict of guilty being returned against him. It will be necessary to make a somewhat extended statement of the evidence heard at the trial, in order to give proper illustration to the argument of appellant, and to the propositions which he advances, and which he claims entitle him to have the judgment reversed. In this statement we shall refer most particularly to the testimony introduced on behalf of the prosecution. The attempt will be only to first furnish in narrative a history of the alleged crime, as the evidence for the people tended to prove it, and we will later consider the competency of the testimony as it is met by objections urged on behalf of the appellant.

In the year 1905 there existed in the United States an organization designated as the International Association of Bridge and Structural Ironworkers. It was an organization, as its name implies, made up of various suborganizations or labor unions scattered throughout the country. The objects as declared by its constitution were "to cultivate feelings of friendship among the craft, to assist each other to secure employment, to reduce the hours of labor, to secure adequate pay for work, . . . and to elevate the moral, intellectual and social condition of all members, and to improve the trade." The offices of the association were in Indiana, and a system was provided by which funds should be collected and disbursed. J. J. McNamara was the secretary and treasurer of the association during the time herein mentioned. The association in 1905 declared a general strike against the American Bridge Company, which was a large contracting concern engaged in the erection of structures of iron and steel. One of the objects desired by the association was to compel all employers who were using nonunion labor to unionize their plants and employ only members of the recognized union. The American Bridge Company was one of the chief employers of nonunion labor, but was not the only concern carrying on business on the open-shop plan in the structural

iron and steel line.   J. J. McNamara, apparently without any authority given him by the constitution or members of the organization, unless that authority is deemed to be an implied one, encouraged persons to destroy various work being constructed under the open-shop plan.   In 1908 and 1909, bridges, viaducts, and other structural work being done by nonunion employers, to the number of perhaps twenty, were destroyed by dynamite or nitroglycerin.   Most of these explosions were produced with the knowledge and active encouragement of J. J. McNamara, and funds of the association were used to pay the persons who destroyed the work.   The evidence was sufficient to show that the purpose of J. J. McNamara and fellow-officers of the association was to compel the employers of nonunion labor to accept the dictates of the association, and, in order to do this, the means apparently most ready and acceptable to their hands was the use of dynamite and other high explosives for the purpose of ruining work under construction and destroying the results of the labor of the nonunion employees.   It was customary for the heads of local unions scattered about the country, when they desired assistance in protecting their cause in the particular locality, to request of the International Association funds and assistance.   In 1910, the attention of J. J. McNamara and his fellow officers was directed to the state of California and particularly to the city of Los Angeles, which was known to be to a considerable extent an "open-shop" city.   One Clancy, a leader of an ironworkers' union in San Francisco, wrote to J. J. McNamara several times, asking that a certain man be sent to the west (this man being one Hockin, who had produced several explosions theretofore in the east).   J. J. McNamara did not send Hockin, but did send his brother, J. B. McNamara.   J. B. McNamara reached Seattle and was there visited by Clancy, and he then proceeded to San Francisco. The McNamaras had themselves concocted an infernal machine which had been used to produce the explosions on the nonunion work.   This machine consisted of a "tattoo" clock attached to a board, to which board was also attached a dry battery.   By a system of wiring, the clocks on the alarm dials could be set at any chosen hour, and when that hour arrived and the bell-hammer commenced to vibrate, electrical connection would be made from the battery to a fulminating cap attached to dynamite, or whatever explosive was used, and

thus the results planned for would be accomplished. J. B. McNamara, in the office of the association in Indianapolis just before he left there for the coast, said, in the presence of his brother and one McManigal, that he was going out and give them "a damned good cleaning up." At the time J. B. McNamara arrived in San Francisco a great effort was being made to unionize the city of Los Angeles in the iron-working trades, and a great deal of money was spent in that endeavor. The "Los Angeles Times" and the Merchants & Manufacturers' Association of Los Angeles had both advocated the open-shop plan of labor employment, and had been most active in work in opposition to the efforts of the unions to stamp out the open-shop policy. One Zehandelaar was the secretary of the Merchants & Manufacturers' Association, and Harrison Gray Otis was president and manager of the "Los Angeles Times." The defendant was a union worker who resided in San Francisco at and before the occurrence of the explosion which caused the death of Hagerty. He had been active in the work of attempting to unionize the city of Los Angeles, and had visited that city immediately before meeting McNamara, in the interests of the unionist work. Immediately upon the arrival of J. B. McNamara in the city of San Francisco he was visited by defendant frequently. On the seventeenth day of September, 1910, defendant wrote out (the evidence proved his handwriting), an advertisement which was published in two San Francisco newspapers, in the following form:

"Wanted—By party of men, 16–24 foot launch for ten days; cruise around Bay and tributaries. Best of references."

Soon thereafter a launch was rented from a boat furnishing concern. This launch was a power launch and was called the "Pastime." About the same time a man appeared at the office of a company manufacturing high explosives, which office was located in the city of San Francisco. This man desired to purchase a very high explosive, asking for "90 per cent nitroglycerin." Upon inquiry being made as to what work was to be done with it, the manufacturing company's representative was informed that it was desired to be used in blowing out stumps. The applicant was expostulated with by the manufacturer's agent and told that such a high percentage of explosive was not needed, but that a forty per cent grade would be sufficient. However, the higher per cent

quality was insisted upon, with the result that an order was given by the agent to his company to have manufactured five hundred pounds of eighty per cent dynamite. The manufacturing plant of the powder company was located across the bay from San Francisco, and from that plant was later taken the explosive by defendant and two other persons. After securing the launch for a rental period, the men went to Oakland and procured some enameled letters which they placed over the name painted on the launch, and changed it from "Pastime" to "Peerless." Schmidt was one of these men who appeared at the different places. One of the defendant's eyes was defective, and quite noticeably so to the ordinary observer. He was identified by storekeepers at Oakland, by a boathouse-man at Sausalito, where the name of the launch was changed, and by the delivery agents of the powder manufacturing company at the latter's plant. He was identified by persons who were acquainted with his physical characteristics, and who saw him at the numerous times when he visited McNamara during the latter's stay in San Francisco. It will be unnecessary to mention particularly the evidence which described the defendant as being a participant in the work of securing the dynamite. It is enough to say that there was ample evidence to authorize the jury to conclude that he was one of the persons so concerned. The dynamite having been secured, it was taken to the city of San Francisco, and a large part of it stored in an empty house which was rented for the purpose. On the morning of October 1, 1910, an explosion occurred in the building in which the "Los Angeles Times" was published and which was owned by the Times Publishing Corporation. The explosion occurred at 1 o'clock in the morning at a time when numerous of the employees were still at work, the journal published being a morning newspaper. The explosion occurred in a little alley-way which, on the ground floor, separated two portions of the building and which was closed overhead. The explosion was of such violence as to rend iron or steel beams, and to force debris through the roof of the building and to a considerable height above. Fire immediately succeeded the explosion and the building was almost entirely destroyed, twenty-one persons being killed, among them Charles Hagerty. One witness testified to having seen a man whom he believed to be J. B. McNamara in the lower building of the "Times" the night before

the explosion occurred. On the morning of the 1st of October, a suitcase was found near the residence of the president of the Times Company by police officers. One of the officers started to cut open the suitcase, when a whirring noise was heard, and the men immediately got out of the way. When they reached a distance of one hundred feet or more there was an explosion which blew a large hole in the ground, tore the leaves from trees, and broke a number of windows in the neighborhood. At about the same time a package was found close to the residence of Zehandelaar, the secretary of the Merchants & Manufacturers' Association. This package was found to contain a number of sticks of dynamite and an infernal machine manufactured in exactly the way that the McNamaras had before fashioned those instruments of destruction. The dynamite found in this parcel was stamped with the name of the company which furnished the explosive to the defendant and McNamara in San Francisco, and upon being analyzed by a chemist was found to be of the same composition as the lot procured from the company by Schmidt and McNamara. One witness testified that in the summer of 1910 he had a conversation in San Francisco with the defendant, and asked him at that time where he had been. The witness then said: ''He said he had been down to Los Angeles, and so we got to talking further. He says, they are having an awful time down there, he says. He says, they are beating up men down there—they won't give a union man any chance down there at all. It is a regular Otis town they are running. There is something going to happen to him pretty soon.'' After the indictment of defendant, search being made for him, he was not to be found. It was shown in testimony that he had gone to New York and lived at the house of Emma Goldman, a portion of the time under an *alias*. One witness testified that defendant told him that he had intended to go to London, England, but that he could not get away from New York on account of the war. Further, that he (Schmidt) said that if he had had the Los Angeles job alone he could have got out all right with it. The person McManigal, who has been before referred to herein, testified on behalf of the prosecution, and gave evidence relating to the general destructive operations inaugurated and carried out under the direction of J. J. McNamara. The records and

33 Cal. App.—28

files found in the office of the association at Indianapolis, embracing correspondence had by McNamara with various persons concerned in producing explosions, were introduced in evidence. Taking the testimony all in all, and leaving out of consideration the matter of its competency at this point, it must appear that the evidence was ample to show the active participation of the defendant in the crime which had been committed. To what has been stated, it may be added that there was competent and sufficient evidence to show that the explosion in the Times building was the result of exterior agency, an explosive brought on to the premises and used in an unlawful way. The foregoing is a somewhat meager abstract of the evidence and presents its salient features only. The testimony given at the trial covers about eight thousand pages, and more than six hundred exhibits were introduced before the jury.

The points relied upon by appellant as furnishing ground for his claim that the judgment and order in this case should be reversed will be considered in the order in which they are proposed by his brief.

The defendant upon being brought into court presented a motion in which numerous alleged grounds were set forth as reasons why the indictment should be quashed. One of the principal grounds asserted was that four of the grand jurors were disqualified by reason of bias and prejudice. Defendant, in his affidavit which was presented with the motion, set out many alleged facts which would tend to show that the grand jurors challenged had been, prior to their being sworn on the jury, active in securing information relative to the matter of the explosion which produced the death of Hagerty and the fellow-employees. Under section 995 of the Penal Code, as that law existed at the time of the commission of the alleged homicide, and at the time the indictment was filed, a defendant accused by indictment was permitted, on his motion to set aside the indictment, to urge any ground good on challenge to a trial jury, either as to the panel or an individual juror. In 1911, before the indictment was filed, the legislature by act amended section 995 of the Penal Code, and by that amendment took away the right to urge on such a motion the last-mentioned causes. This act became effective in the latter part of May of the same year, the indictment having been filed in that month of May, but prior to the tak-

ing effect of the law.  An affidavit was made by the grand jurors challenged, setting forth in a general way that they had acted without prejudice in the consideration of the defendant's case, and had been uninfluenced by reports or information received by them from outside of the grand jury-room.  As the defendant set forth specific facts tending strongly to show that the jurors challenged could scarcely avoid feeling a bias in his case, it is extremely questionable that this affidavit made on behalf of the jurors could have been considered as a complete answer to the motion, as to the particular ground mentioned.  However, the defendant did ask leave to examine the jurors in open court, which leave was denied him, and this brings us directly to the important question to be considered, to wit, as to whether the law in existence at the time the motion to quash the indictment was made, was applicable to the proceedings on that motion, or whether the law in force at the time of the commission of the alleged homicide and the filing of the indictment, is the one under which the defendant's motion should have been determined.  If the law applicable was the law in effect at the time of the commission of the homicide and the filing of the indictment, then the court committed error in denying the defendant's motion.

It is the contention of the appellant that the change in the law by which the ground of the bias and prejudice of the grand jurors as foundation for a motion to set aside the indictment, was taken away, if made to apply to the motion when presented by him, would be *ex post facto,* and hence unconstitutional.  The definition of an *ex post facto* law is given very full exposition by the supreme court of the United States in the leading case, which is entitled *Kring* v. *Missouri,* 107 U. S. 221, [27 L. Ed. 506, 2 Sup. Ct. Rep. 443].  In determining whether a law is *ex post facto* or not, the decisions sometimes declare that where such law merely works a change in procedure or remedy, it is not amenable to objection as being unconstitutional on the ground stated.  Such a definition is perhaps too narrow, as the court in the Kring case takes occasion to declare.  In the case cited, referring to *Calder* v. *Bull,* 3 Dall. 386, [1 L. Ed 648], the court approvingly adopts language in definition of the term *ex post facto* when it declares: "It defines four distinct classes of laws embraced by the clause. '1. Every law that makes an action,

done before the passing of the law and which was innocent when done, criminal, and punishes such action. 2. Every law that aggravates the crime or makes it greater than it was when committed. 3. Every law that changes the punishment and inflicts a greater punishment than was annexed to the crime when committed. 4. Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offense in order to convict the offender.' '' The statement of the writer of the opinion in *Calder* v. *Bull* is further quoted, where he says: ''But I do not consider any law *ex post facto,* within the prohibition, that modified the rigor of the law; but only these that create or aggravate the crime or increase the punishment or change the rules of evidence for the purpose of conviction.'' The gist of the decision is that any substantial right which the law gave a defendant at the time to which his guilt relates cannot afterward be taken away from him, even though such law does affect ''procedure or remedy.'' The right referred to, however, must be, and such is the tenor of the decisions, a right material to the establishment of the defense of the defendant. Objections to the form of pleadings, not going to the extent of reaching a defect in the statement of facts showing the offense, generally and naturally must be held to fall within that class of law changes which do relate to procedure merely, and to procedure *not such as a defendant accused of crime may be said to have a vested right in.* A law curtailing the number of peremptory challenges which a defendant may interpose to the trial jury is held not to be *ex post facto.* (*Harris* v. *United States,* 4 Okl. Cr. 317, [Ann. Cas. 1912B, 810, 31 L. R. A. (N. S.) 820, 111 Pac. 982].) Laws which in a statute passed after the commission of a crime and before the trial, make witnesses competent to testify who at the time of the commission of the offense were by law incompetent, are held not to deprive a defendant of a substantial right. (*Mrous* v. *State,* 31 Tex. Cr. 597, [37 Am. St. Rep. 834, 21 S. W. 764]; *Hopt* v. *Utah,* 110 U. S. 574, [28 L. Ed. 262, 4 Sup. Ct. Rep. 202]. See, also, note to *People* v. *Hayes,* 140 N. Y. 484, 37 Am. St. Rep. 594, [23 L. R. A. 830, 35 N. E. 951].) Our own supreme court, in the case of *People* v. *Campbell,* 59 Cal. 243, [43 Am. Rep. 257], has held that where a homicide was committed before the adoption of the constitution of 1879, and at a time when

the law required that the defendant be prosecuted by indictment of a grand jury, and by the constitution before trial it was provided that the prosecution might be either by indictment by grand jury or information of the district attorney, that a prosecution by information was not invalid, and that the law then in force was not open to the objection that it was *ex post facto.* In that case the court adopted the language of Judge Cooley, as contained in his work on Constitutional Limitations, page 331, and which finds place repeatedly in decisions dealing with the subject under consideration, and quotes: "But so far as mere modes of procedure are concerned, a party has no more right in a criminal than in a civil action to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings, if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose. The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure, though it cannot lawfully, we think, in so doing, dispense with any of these substantial protections with which the existing law surrounds the person accused of crime. Statutes giving the government additional challenges, and others which authorized the amendment of indictments, have been sustained and applied to past transactions, as doubtless would be any similar statute, calculated simply to improve the remedy, and in its operation working no injustice to the defendant, and depriving him of no substantial right." The court further says, referring to the text of Judge Cooley's work: "The following examples are given by him in a note to page 332: 'The defendant in any case must be proceeded against and prosecuted under the law in force when the proceeding is had. A law is not unconstitutional which precludes a defendant in a criminal case from taking advantage of remedies which do not prejudice him; nor one which reduces the number of the prisoner's peremptory challenges; nor one which, though passed after the commission of the offense, authorizes. a change of venue to another county; nor one which modifies, simplifies, and reduces the essential allegations in a criminal indictment, retaining the charge of a distinct offense.' . . . It is not an

uncommon practice to change the number of grand jurors required to investigate criminal charges, but we have never heard of the right of the legislature to make such changes questioned, neither has it ever been claimed that the charge must be investigated by the precise number of grand jurors of which that body was composed, at the time the act was committed. . . . 'The legislature may always alter the form of administering right and justice, and may transfer jurisdiction from one tribunal to another.' Mr. Bishop, in his work on Statutory Crimes, lays down the same doctrine. He says: 'There is no such thing as a vested right in any particular remedy.' '' (See, also, *People* v. *Mortimer*, 46 Cal. 114.) The time important to be taken into consideration in determining whether a law is *ex post facto* or not is the time (and the state of the law) at which the alleged offense was committed. "If the law complained of was passed before the commission of the act with which the prisoner is charged, it cannot, as to that offense, be an *ex post facto* law. If passed after the commission of the offense, it is as to that *ex post facto,* though whether of the class forbidden by the constitution may depend on other matters. But so far as this depends on the *time* of its enactment, it has reference solely to the date at which the offense was committed, to which the new law is sought to be applied. No other time or transaction but this has been in any adjudged case held to govern its *ex post facto* character." (*Kring* v. *Missouri,* 107 U. S. 221, [27 L. Ed. 506, 2 Sup. Ct. Rep. 443].) It happened in this case that the law making the change in the statute was passed after the commission of the alleged offense and before the indictment was filed, but that it did not become operative until after the indictment was filed. It was in effect before the defendant was arrested and before he made his motion to quash the indictment. As this law in its changed form referred to the procedure under which the defendant might attack the indictment, it on its face was effective at the time the motion to quash was made, and was the procedure to be looked to in governing the motion of the defendant. That it did not deprive him of a right substantial in his defense, we are also assured. A defendant under our law may be prosecuted by indictment or by information after commitment by a magistrate. There is no legal impediment at all, if the lawmakers so decide, in permitting a commitment to be made

by a biased or prejudiced magistrate, or an indictment to be returned by a grand jury holding preconceived views as to the guilt of a defendant. The indictment surely must be made to state a public offense, for the defendant cannot be legally put upon trial upon one which is insufficient in that respect. The matter of the production of an indictment by grand jury or commitment by a magistrate neither presupposes the guilt of a defendant nor in any wise tends to create any presumption in that direction. It furnishes a procedure by which the defendant is brought into court, and if this procedure on its face is formally regular, any special objections which are to be established by facts *dehors* the record, must be viewed as not of the substance of things or material in influencing the conviction of a person accused of crime. "An indictment is but an accusatory paper." (*People* v. *Hatch,* 13 Cal. App. 521, 528, [109 Pac. 1097].) Our code by specific provision declares that, unless objections available to a defendant on a motion to quash an indictment or information are taken seasonably, they are waived; in other words, the indictment or information, because of any defects which might be pointed out upon the motion to quash, is not a void indictment and the question of legal jurisdiction is not concerned therein. (Pen. Code, sec. 950; *Ex parte McConnell,* 83 Cal. 558, [23 Pac. 1119]; *People* v. *Bawden,* 90 Cal. 195, [27 Pac. 204]; *Ex parte Moan,* 65 Cal. 216, [3 Pac. 644].) We cite these cases and the code law in illustration of the view we take, that the amended section of the Penal Code in force at the time the defendant made his motion to quash the indictment, not only related to a matter of procedure, but to such matter of procedure as neither went to the question of the guilt or innocence of the defendant nor tended to deprive him of any subtsantial right theretofore secured to him in aid of a full defense.

In the motion to quash the indictment, it was also asserted by the defendant that persons other than those authorized by the law were permitted to be present during the proceedings taken before the grand jury, and that evidence of illegal, hearsay, and secondary character was permitted to be introduced and was considered. It is well settled, not only that a defendant on a motion to quash an indictment can only urge such grounds as are, by section 995 of the Penal Code, permitted him, but that no inquiry can be made as to the suffi-

ciency of the evidence or of the mode of examining the witnesses heard before the grand jury. (*In re Kennedy,* 144 Cal. 634, [103 Am. St. Rep. 117, 1 Ann. Cas. 840, 67 L. R. A. 406, 78 Pac. 34].) To the same effect is *People* v. *Hatch,* 13 Cal. App. 521, [109 Pac. 1097]. In support of the ground that an unauthorized person was permitted to be present during the proceedings had before the grand jury, the defendant referred to Earl Rogers, Esq., who appeared in the capacity of a deputy district attorney of Los Angeles County. It was shown that said Rogers had been duly appointed as a deputy by the district attorney, but it is urged that as all of the deputies permitted to be appointed under section 4230 of the Political Code, had theretofore been appointed, the appointment of Mr. Rogers was in excess of that number, and he acquired no official capacity as a prosecutor in order to entitle him to be present himself before the grand jury. Section 4230 of the Political Code refers particularly to the salaries of officers, and does designate the various deputies who shall be allowed, *with pay,* to each of the county officers in counties of the class to which Los Angeles belongs. That section is particularly designed to fix the compensation of county officers, and not to limit them in the employment of deputies. A county officer is entitled to appoint as many deputies as he chooses, with the proviso that if he appoints any in excess of those for which compensation is provided to be paid from the public treasury, he must pay such deputies if they are to receive compensation. (Pol. Code, sec. 4024.)

The next complaint made by appellant is that the trial judge committed prejudicial error in disallowing certain challenges taken by the defendant as to seventeen of the veniremen who were examined as to their qualifications to sit as jurors and try the defendant for the crime charged. The challenges interposed were all upon the ground of the actual bias of the veniremen. As was most natural to occur, after the destruction of the Times building reports as to the cause thereof were widespread and became the subject of discussion between individuals, as well as furnishing material for various reports in the newspapers. Prior to the impanelment of the jury which sat at the trial of this defendant, the two McNamaras jointly charged in the same indictment with defendant, had pleaded guilty and been sentenced, and this in-

formation had been heralded forth through like channels. Many of the veniremen called had read newspaper reports and heard street discussion regarding the explosion and its cause. The state of mind of each of the seventeen veniremen, as developed by the lengthy examination of counsel, was in the main similar as to the matters constituting the alleged bias. A general statement of the answers brought forth, with little variation, was about as follows: The venireman had heard of the explosion in the Times building shortly after it occurred; he had read accounts thereof in the newspapers and had discussed with persons not concerned in the case the subject of the explosion; that these accounts assigned the cause of the wrecking of the Times building as being the explosion of dynamite unlawfully used; that upon the McNamaras pleading guilty to the charge, venireman had read an account of the proceedings and from all of these things had formed an opinion that the Times building had been blown up by dynamite unlawfully exploded with criminal intent; that the opinion was more or less fixed and that evidence would be required to dislodge it. None of the veniremen in any opinion or belief which they entertained, connected the defendant with the commission of the crime, save one, who stated in a general way that he held an opinion affecting the guilt of the defendant. Some of the veniremen had passed the scene of the explosion and had observed the wreckage, with twisted iron beams, and in some cases had observed that windows in an adjoining building had been shattered. In the course of their questioning, counsel for the defendant intimated that it was a part of their defense that the Times building was destroyed by a gas explosion accidentally, and not by dynamite with criminal intent. The argument in support of the challenge was that, as these veniremen had formed an opinion as to the facts establishing the *corpus delicti,* they were utterly disqualified, notwithstanding that they in no wise in their opinion otherwise connected the defendant with the commission of the crime. It satisfactorily appeared from the answers given by the veniremen that the foundation for any opinion entertained by them was that denominated in section 1076 of the Penal Code, as "public rumor, statements in public journals, or common notoriety"; and each of the persons examined declared that he had the ability to lay that opinion aside and to consider the case against the defendant fairly

and impartially. This statement was brought forth by the examination of the district attorney in order to justify a denial of the challenges in accordance with the provisions of section 1076 of the Penal Code, which declare that where the opinion is of the class mentioned the person should not be disqualified as a juror, "provided it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him." As has been already suggested, it appeared that the explosion which destroyed the building of the newspaper was of such character as to occasion general discussion among the citizens of the community and much comment in the public journals. It would seem difficult indeed to have found any citizen of observing mind and fair intelligence who had not by some manner or means learned of the disaster, and of the probable or possible cause thereof. It has been repeatedly declared by our supreme court that on challenges such as those here considered, in order to justify a reversal, the evidence given by the venireman upon his examination must be practically without conflict as to the vital points thereof, and be "so opposed to the decision of the trial court that the question becomes one of law." (*People* v. *Owens,* 123 Cal. 482, [56 Pac. 251].) And particularly pertinent to the situation which was presented in this case are the observations of Mr. Justice Henshaw in the case of *People* v. *Scott,* 123 Cal. 434, [56 Pac. 102], where he says: "A reading of the testimony taken on *voir dire* discloses, as is usual, conflicting and contradictory statements by the jurors. They had formed opinions touching the guilt or innocence of the defendant. They would carry these opinions with them into the jury-box. It would take evidence to remove them, nevertheless they could and would give the defendant a fair and impartial trial. They could and would be governed by the law as delivered by the court, and by the evidence as received in court. It is the state of facts commonly presented where upon the question of bias the evidence would have justified a finding either way. Under such circumstances we are powerless to disturb the ruling of the trial court. (Citing *People* v. *Fredericks,* 106 Cal. 554, [39 Pac. 944].) We recognize that with the increased facilities for the dissemination of news it is far more difficult than formerly it was to obtain a jury of men ignorant

of the circumstances of the charge which they are called upon
to try. . . . But, unless the testimony adduced upon *voir
dire* is so clear upon the question of actual bias that this court
can say as matter of law that the juror is disqualified for that
reason, we cannot disturb the ruling of the trial court.'' To
like effect are many of the decisions, and we cite: *People* v.
*Flannelly,* 128 Cal. 83, 84, [60 Pac. 670] ; *People* v. *Ochoa,*
142 Cal. 268, [75 Pac. 847] ; *People* v. *Miller,* 125 Cal. 44, [57
Pac. 770] ; *People* v. *Brown,* 148 Cal. 743, [84 Pac. 204].
In so far as the examination of the jurors disclosed that their
observation of the conditions at the wrecked building after
the explosion contributed to the forming of the opinion they
had, it appears that such observation only tended to convince
them of the fact that there had been an explosion, and not as
to the means employed. It seems to have been conceded, even
in the questions of counsel propounded to the veniremen, that
an explosion had in fact occurred. The denial of the chal-
lenges for actual bias cannot be said to have been improperly
made.

We now come to a consideration of the kind and competency
of the evidence which made up the proof offered by the prose-
cution. As a part of its case, the state, as we have before indi-
cated, introduced testimony showing a series of unlawful acts
which had been committed some time prior to the first appear-
ance of the appellant Schmidt in his connection with the anti-
open-shop campaign. This testimony included evidence of
the fact that bridges had been blown up, material destroyed,
and life threatened throughout a number of the eastern states
as a result of the determination of the executive board of the
International Association of Bridge and Structural Ironwork-
ers to unionize work; that money had been paid to various
persons for the purpose of compensating them in the unlawful
and reprehensible enterprise. Conversations occurring be-
tween the persons so engaged, some of them referring to ex-
plosions which had already occurred, some of them referring
to future plans in the same direction, were narrated; in fact,
it is apparent that any and every act of the individuals con-
cerned referring to the unlawful enterprise, wherever evi-
dence thereof could be procured, was presented to the jury.
The record of correspondence kept in the office of J. J.
McNamara, the secretary-treasurer of the International Asso-
ciation, was obtained and was also produced in evidence. This

was correspondence passing between the office of McNamara and various persons concerned in the unlawful depredations undertaken by the executive board of the association, and it came and went to different cities scattered over the United States. The work of destruction of structures erected by open-shop contractors in the east was well under way before Clancy's appeal for help in California was received and heeded. As a result of that appeal J. B. McNamara came west on his mission of destruction. Plainly from the sketch we have made of the evidence, it was made to appear by overwhelming proof that a conspiracy was organized and the work thereof prosecuted to the end that at every place in the United States where the open shop was in force it was planned to use the weapon of nitroglycerin or dynamite to intimidate those opposed to the demand of the executive board of the International Association. The evidence showed that this conspiracy, so gigantic in its scope, was a continuing one—that is, the only limit to its life seemed to be the exhaustion of the means available to the executive board, or the submission of the employers of nonunion labor. And we think that counsel for appellant fails to apprehend the effect of the evidence to establish the conclusions just suggested, when he refers to the destructive work done in the east as work done in the "Eastern conspiracy." The distinction so sought to be impressed, and which we cannot allow, is made for the purpose of giving weight to the argument found in the brief of appellant, that the appellant Schmidt not being a party to the lawless acts committed in the east, was prejudiced because of evidence being introduced with reference to such acts. Conceding the correctness of his premise, we might well adopt the appellant's conclusion. But the basis for the argument is lacking in the proof. It is a fundamental rule long settled by decisions that in proving a conspiracy it is not necessary that proof be made that the parties met and actually agreed to undertake the performance of the unlawful act, and that a conspiracy may be shown by proof of facts and circumstances sufficient to satisfy the jury of the existence of the conspiracy, leaving the weight and sufficiency of the evidence to the triers of the questions of fact. (*People* v. *Donnolly,* 143 Cal. 394, [77 Pac. 177] ; *People* v. *Lawrence,* 143 Cal. 148, [68 L. R. A. 193, 76 Pac. 893] ; *People* v. *Eldridge,* 147 Cal. 782, [82 Pac. 442].) It is not denied that after a conspiracy has been

established, and it has been established that a person is con-
nected therewith as a conspirator, the latter may be prose-
cuted as for complicity in any unlawful act thereafter com-
mitted by any of the conspirators which is within the scope
of the general design or plan. (*People* v. *Olsen*, 80 Cal. 122,
[22 Pac. 125].) "Where several parties conspire or combine
together to commit any unlawful act, each is criminally re-
sponsible for the acts of his associates or confederates com-
mitted in furtherance of any prosecution of the common
design for which they combine. . . . Each is responsible for
everything done by his confederates, which follows incident-
ally in the execution of the common design as one of its prob-
able and natural consequences, even though it was not
intended as a part of the common design for which they
combined." (*People* v. *Kauffman*, 152 Cal. 331, [92 Pac.
861] ; *People* v. *Creeks*, 170 Cal. 368, 369, [149 Pac. 821] ;
*Spies* v. *People* (*The Anarchists' Case*), 122 Ill. 1, [3 Am. St.
Rep. 320, 12 N. E. 865, 17 N. E. 898].) In *People* v. *Collins*,
64 Cal. 293, [30 Pac. 847], our supreme court says: "The
law holds each party to it (the conspiracy) responsible for
the acts of each co-conspirator done in pursuance and further-
ance of the common design, which extends to the consequences
which might reasonably be expected to flow from carrying into
effect the unlawful combination." And again: "Evidence
of the statements of a co-conspirator, made during the life of
the conspiracy, are admissible against the other conspirator."
(*People* v. *Oldham*, 111 Cal. 648, [44 Pac. 312].) An exam-
ination of the decision in the case of *Ryan* v. *United States*,
decided by the circuit court of appeals and reported in 216
Fed. at page 13, [132 C. C. A. 257], shows that a number of
persons, thirty in all, they being connected with the same
association hereinbefore referred to, were indicted for a con-
spiracy to commit the crime of transporting dynamite and
nitroglycerin in interstate commerce in passenger trains, the
facts of the case referring to the same occurrences and the
same conspiracy as the prosecution here made proof of. It
seems that practically the same testimony as to the various
explosions produced, the means employed, the correspondence
had, together with conversations between the participants in
those crimes, were all offered and received in evidence. The
court there declared that such evidence was competent in that
a continuing conspiracy was charged. If the evidence was

admissible there to show a continuing conspiracy as charged, it may with as much propriety here be said that the evidence did establish that the conspiracy was of that nature. Being of that nature, it was proper to show, as the court there held, all of the acts, declarations, and correspondence had by the persons concerned which referred to the means and methods employed, and to be employed, in the furtherance of the common design. It matters not, if the evidence is sufficient to show such later connection, that Schmidt, the appellant here, for the first time took an active part in furnishing aid to the conspirators to effect their objects a considerable time after the eastern explosions had been produced. The proof of all of the matters first adverted to was essential to show the existence of the conspiracy and to define its nature and scope. The necessity of showing appellant's connection with the conspiracy was a distinct and separate matter for proof. This requisite of the law we think was sufficiently covered in the instructions of the court, and the jury was fairly advised of the subjects to which the different varieties of evidence were properly applicable. For the reasons we have stated, validity cannot be granted to any one of the exceptions taken because of the introduction of declarations of any of the conspirators made after any particular of the explosions had been caused, as being declarations inadmissible because made subsequent to the completion or accomplishment of the object of the conspiracy. The conspiracy was still alive and in effect and the ultimate results had not been attained when J. B. McNamara came to the state of California for the purpose of assisting in the work. We have before sketched briefly the salient features of the testimony showing that Schmidt, upon McNamara's arrival in San Francisco, took an active part in securing dynamite for McNamara's use. All of the appellant's acts in that connection were performed as secretly as possible, under assumed names, and with every indication of appellant's complete and active co-operation and sympathy with the work of destruction theretofore done, then being planned, and which was thereafter executed. Schmidt, the appellant, immediately before the Times explosion, had been in the city of Los Angeles aiding in the attempt to close the open shops. That he knew for what purpose the dynamite was to be used, is indicated when he said to a witness who testified in the case, in the summer of 1910, that "they [in

Los Angeles] won't give a union man no chance down there at all. It is a regular Otis town they are running. There is something going to happen to him pretty soon." And immediately after the Times explosion Schmidt was not to be found, and was not found until a long time thereafter, when he was discovered living at the house of Emma Goldman in New York, a portion of the time, under an assumed name. The length of this opinion would be extended to a greater limit than is warranted, were we to attempt to discuss in detail the testimony as it is shown in the eight thousand pages of the reporter's transcript. While there may be portions of the testimony received which in a detached way could properly have been excluded, the weight of the evidence was so overwhelming in its proof of the conspiracy and its objects as to enforce the conclusion that the defendant in the rights secured to him under the constitution did not suffer substantial prejudice. Rather unusual stress is laid in support of the claim for error in allowing one particular bit of evidence to come in. Several months after the explosion which occurred at the Times building, a suitcase was found in the checking-room at a ferry station in San Francisco. The suitcase was identified by a Mrs. Ingersoll as being one which she had seen in the possession of J. B. McNamara before the 1st of October. The suitcase carried a check label, and upon being opened was found to contain an alarm clock, a coil of black fuse, some blasting caps, a brass plate, some brass bars with screws, and copies of San Francisco newspapers dated October 1st. The newspapers contained accounts of the destruction of the Times building. These articles were all exhibited to the jury. We think the evidence was competent. The clock and brass pieces were of a similar kind to those used by the McNamaras in the manufacture of their infernal machines. As proof of the fact that an explosion had been produced as "bargained for," J. J. McNamara, the secretary-treasurer of the association, had always required his men to produce newspaper accounts showing that they had performed their work successfully. In a circumstantial way, these articles were all evidence tending to show the execution of the work of the conspirators and to show J. B. McNamara's connection therewith, and incidentally the connection of Schmidt with the same enterprise. The introduction of similar evidence was approved in *Spies* v. *People (The Anarchists'*

*Case*), 122 Ill. 1, [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898]. The gravity of the offense and the serious consequences which it has entailed to this appellant, is justification to counsel for having presented the very extensive argument which is found in the three volumes of appellant's briefs. Careful consideration has been given to each of the contentions therein set forth, the chief of which are made the subject of the foregoing discussion. Other matters urged as constituting error, such as alleged misconduct of the trial judge and the argument affecting the action of the court in giving or refusing to give certain of the instructions, we find without merit. We are satisfied that the defendant received a fair trial and that his conviction should be sustained.

The judgment and order are affirmed.

Conrey, P. J., and Shaw, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 14, 1917, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 14, 1917.