[Crim. No. 1991.   First Appellate District, Division Two.—April 21, 1938.]

THE PEOPLE, Respondent, v. GEORGE McCOLLUM et al., Defendants; EUGENE CARPENTER, Appellant.

90

Gladstein, Grossman & Margolis and Richard Gladstein for Appellant.

George R. Andersen, as *Amicus Curiae* on Behalf of Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

SPENCE, J.—Defendants McCollum and Carpenter were jointly charged in two counts. In the first count they were charged with assault upon George Martin by means of force likely to produce great bodily harm. In the second count, they were charged with conspiracy in that they conspired together and with other persons to maliciously injure and destroy real and personal property of said George Martin and others. The overt acts alleged in the conspiracy count were the throwing of creosote upon the home of George Martin on March 4, 1937, and the driving in an automobile to the vicinity of the home of George Martin upon said date. Upon a trial by jury, both defendants were acquitted on the first count; defendant McCollum was acquitted on the second count; but defendant

Carpenter was convicted on said second count. Defendant Carpenter's motion for new trial was denied and said defendant appeals from the judgment of conviction and from the order denying his motion for a new trial.

This case arises out of the struggle between two labor unions during the course of which struggle, creosote was hurled onto and into the home of George Martin, a workman who had failed to join one union and was active in promoting the rival union. One of the main contentions of appellant is that the evidence was insufficient to support the verdict finding him guilty of conspiracy and we will therefore briefly set forth some of the evidence showing the events leading up to the actual creosoting of the Martin home.

The National Motor Bearing Company had a plant in Oakland. Prior to February, 1937, some few of its workmen were machinists and were members of the International Order of Machinists, a union affiliated with the American Federation of Labor. Most of its workmen then belonged to no union as they were not members of any craft having a union. In February, 1937, the United Auto Workers Union, being a so-called Committee for Industrial Organization union, started a campaign to enroll as members the employees of the National Motor Bearing Company. While this last-named union was nominally affiliated with the American Federation of Labor, it was under suspension. Leaflets were distributed to said employees announcing meetings and a number of said employees were enrolled as members. On the morning of February 27, the National Motor Bearing Company closed its plant, apparently fearing a "sitdown strike", but several of its old employees remained at work in the plant during the two weeks which followed. During that time and commencing on February 27, the United Auto Workers Union set up and maintained a picket line on the only street leading to the company's plant. Appellant Carpenter was a member of the last-mentioned union, and although never employed by said company, he joined the picket line.

Immediately following February 27th, an effort was made to organize the company's employees into another union, sponsored by the International Order of Machinists and with a direct and unsevered connection with the American Federation of Labor. The complaining witness, George Martin, took an active part in organizing this union. This union entered

into a contract with the company on March 1st and became chartered by the International Order of Machinists as Production Workers Union, Local 1518. The organization of this union was resented by the United Auto Workers Union and feeling ran high. Such feeling was manifested on the trial when one of the defense witnesses referred to said union as a "company union" and to its members as "scabs".

The evidence shows that appellant Carpenter and other members, including the officers of the United Auto Workers Union, were active in the affairs of the union and in directing the activities on the picket line during the race for enrolling members of the rival unions. It is entirely apparent that the plan and purpose of the picket line was to dissuade persons from working at the plant and from joining the other union and to persuade the employees to join the United Auto Workers Union. It is also a reasonable inference from the testimony, as indicated by the district attorney in his opening statement, that appellant Carpenter and others had agreed to induce said employees to join their union by lawful means wherever possible and by unlawful means, including threats of injury and injury to persons and property, whenever necessary. The record is replete with evidence from which this inference may be drawn and we will set forth some of the testimony regarding the acts and declarations of appellant Carpenter himself prior to the evening of March 4th.

One of the employees testified that he had joined the United Auto Workers Union upon the representation that he would not be able to work unless he did join; that he visited the picket line in the first week in March and saw Mr. Slaby, the president of the union and also appellant Carpenter; that Carpenter was writing down addresses and that he asked Carpenter what he was going to do with those addresses; that Carpenter replied, "If they don't join the union, we will dump them".

Another employee had joined said union and was a member of the picket line for about two weeks. He testified that he saw appellant Carpenter on the picket line the first two or three days and that he had been in two conversations in which appellant Carpenter took part. In the first conversation, there was general conversation about threatening some of the employees who were still working in the plant, including George Martin and his brother. Carpenter asked if anyone knew the addresses of these employees. He said, "We

are going to call on them''. A few days later, being in the first few days of March, there was a second conversation in which it was stated that ''there were a number of ways of persuading them not to work''. Carpenter then suggested ''that creosote was a fine, persuasive method of keeping anybody from working. . . . It did not come out of wood or plaster or anything of that sort. The material it was on would have to be removed; it could not be painted over or anything of that sort.''

On the evening of March 2d a delegation consisting of Al Soderlund, secretary of the United Auto Workers Union; Jack Townsend, and others, called at the home of George Martin for the admitted purpose of persuading him to become a member of the United Auto Workers Union. Townsend, a witness for the defense, testified, '' . . . he came to the door, he seen who it was and he seemed very nervous and afraid. He was afraid to come out on the porch. He said we were up there to beat him or do something.'' This delegation left two applications for membership in their union, one for George Martin and one for his brother, and told George Martin they would return the following evening to learn what the decision was. George Martin testified that one of the delegation told him that if he had not decided by the next night, ''That they would not be responsible for what happened to him.''

On the following night, March 3d, a second delegation called, one of whom was recognized by Martin's sister as Roy Kristy. George Martin had instructed his sister to tell them he was not at home. She did so, but two or three cars paraded up and down in front of the Martin home all evening. On the following day, March 4th, a tradesman leaving the company's plant, was stopped by Kristy at the picket line and was asked who was working in the plant. The tradesman mentioned the name of George Martin and Kristy said, ''George, we are going to get him.'' Townsend and Kristy were among those serving in the picket line on that day.

The creosoting of the Martin home occurred at about midnight on the night of March 4th. The testimony showed that at about 9:30 on that night, two men approached the front steps of the Martin home and looked at the address and then returned to an automobile. One of said men was identified as appellant Carpenter and the automobile was identified as that of defendant McCollum. The Martin house was the

second house from the corner and the testimony showed that said automobile patrolled around the vicinity and was seen from the Martin house about eight or ten times between 9:30 and 11:30. Shortly before midnight the Martins left the living room at the front of the house and went to the kitchen at the rear of the house. At midnight they heard the crashing of the window of the living room, but when they arrived at the front of the house, they could see no one. The object which had been thrown through the window was a bottle of creosote. There were creosote stains both inside and outside of the house and three bottles, which had contained creosote, were found in front of the house, one broken and the others empty, but covered with creosote. During the days that followed, Townsend and others passed the house several times, staring at the house and laughing as they went by.

McCollum and Carpenter were apprehended and questioned. Carpenter admitted being with McCollum on that evening at the picket line at about 9 o'clock, but when asked what he had done after that, he replied, ''I won't say what I done between that time and the time I arrived home,'' which latter time he then said was about 12 or 12:30. He was asked if he had handled any creosote during the past week and he said, ''I won't say yes and I won't say no.'' He was asked if he left the picket line with McCollum that night and he replied, ''I won't admit it and I won't deny it.'' He was asked if he and another man left the automobile on Sixty-second Avenue, being near the Martin home, and he said, ''I won't admit it and I won't deny it.'' When asked if he threw any creosote on the house of George Martin, he said, ''The same answer goes.''

McCollum answered quite freely when questioned and signed a written statement. His written statement was offered in evidence by counsel representing both defendants and was admitted without any request or order restricting or limiting its application. In this statement McCollum said that he received a telephone call at about 8 o'clock on the evening of March 4th from an unknown person stating that Carpenter wanted McCollum to meet him at Carpenters Hall, where there was to be a meeting; that he drove there and picked up Carpenter and his wife and drove to the company's plant, where there were a number of pickets, including Slaby and Humphreys; that they went from there to a saloon and

later returned to the picket line, where a man unknown to McCollum got in the car; that they then went to the soup kitchen and thereafter went driving around in the car on certain streets which it appears were in the vicinity of the Martin home; that they parked on some street between Sixty-second and Sixty-third Avenues where Carpenter and the stranger got out and went around the corner; that they returned in about five minutes and Carpenter said, "Let's go"; that as they drove away one of the two men said, "Well, that's over with." In this written statement he said, "I have no knowledge to what these men were going to do, or their intentions were, but during the time we were together in the car I felt there was something suspicious about the whole thing. I did notice that Carpenter did have a bottle in his right coat pocket when he got out of the car after parking on the street between Sixty-second and Sixty-third Avenues, where Carpenter told me to wait until he came back. There appeared to be an odor of lysol about him or coming from his person. When he re-entered the car, there was a stronger odor of lysol about him. At no time did I arrange to take part in the creosoting of any house or take part in the violation of any law with these men. If any crimes were committed during the above period, I knew nothing of it."

Upon the trial both McCollum and Carpenter admitted being in the vicinity of the Martin home on the night of March 4th in the McCollum automobile. They further admitted that they stopped there and that Carpenter and a man unknown to either of them got out of the automobile, walked down the street and returned a few minutes later. It was claimed, however, that this was around 10 o'clock and that the purpose of the stop was to permit the men to answer a call of nature. In view of the other testimony in the record, the jury was justified in discrediting the last-mentioned portion of the testimony.

From the foregoing summary of some of the testimony, we believe it is apparent that appellant's contention that the evidence was insufficient to support the verdict finding him guilty of conspiracy cannot be sustained. It was a reasonable inference from said testimony not only that a conspiracy existed and that appellant was a member thereof, but also that appellant was a moving spirit in said conspiracy and one of the persons who carried its plan into execution with refer-

ence to George Martin. ■ The mere fact that McCollum was acquitted does not render the verdicts inconsistent, for it was charged that Carpenter, McCollum and others entered into the conspiracy. It is probable that the testimony of McCollum and his statements made after his arrest caused the jury to entertain a reasonable doubt as to his complicity in the conspiracy. ■ Nor does the fact that appellant Carpenter was acquitted on the first count render the verdicts inconsistent. The charge in the first count was that of assault upon the person of George Martin. It appears from the evidence that George Martin was in the rear of his home at the time the bottle was thrown through the front window and that he could not have been struck thereby. The jury, therefore, correctly acquitted on the first count. (Pen. Code, sec. 240.) But said acquittal was not tantamount to a finding that appellant did not throw a bottle of creosote at the Martin home, which was the first overt act charged in the second count.

■ Appellant further contends that the trial court committed prejudicial error in its rulings on the admissibility of evidence. It would serve no useful purpose to set forth each of the specifications of alleged error. All of said specifications related to testimony concerning the acts and declarations of the alleged coconspirators. As the evidence was sufficient to show that the conspiracy existed, that the alleged coconspirators were members thereof and that said acts and declarations were in furtherance of said conspiracy, we are satisfied that the trial court properly admitted such testimony. (*People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555]; *People* v. *Gregory,* 120 Cal. 16 [52 Pac. 41]; *People* v. *Collier,* 111 Cal. App. 215 [295 Pac. 898].)

■ Appellant further contends that the trial court committed prejudicial error in the giving and refusing of instructions. Appellant devotes but two pages of his brief to this subject. He set forth none of the instructions and cites no authority to sustain his position. His claim that it was error to refuse to advise a verdict of not guilty cannot be sustained in view of the fact that the evidence was sufficient to sustain the verdict of guilty. A reading of the entire charge shows that the jury was fully and fairly instructed and that the claims of error suggested by appellant are without foundation.

The judgment and the order denying a new trial are affirmed.

Sturtevant, J., and Nourse, P. J., concur.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 6, 1938, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 19, 1938.