[No. 11029.   Department Two.   July 30, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v. C. M. PETTIT, *Appellant*.[1]

INDICTMENT AND INFORMATION—REQUISITES—DUPLICITY—LARCENY. An information charging larceny by color and aid of false pretenses and also as bailee or trustee, charges the commission of the offense in two ways specified by Rem. & Bal. Code, § 2601, and since they are not repugnant and proof of one means is not inconsistent with proof of the other, the information does not charge more than one crime and is direct and certain within the requirements of Rem. & Bal. Code, §§ 2057, 2059.

SAME—REQUISITES — ALTERNATIVE MEANS — JOINDER OF OFFENSES. Where a statute defining a crime specified different ways in which it may be committed, connecting the same with the disjunctive "or," an information may charge alternative means connecting the same with the conjunction "and."

CRIMINAL LAW—TRIAL—ADMISSIONS OF PROSECUTOR.   An admission by the prosecuting attorney that a conviction was not expected under one of the alternative charges in the information, does not conclude the court or make it error to instruct the jury thereon; since the court is not controlled by the attitude of the prosecuting attorney.

CRIMINAL LAW—APPEAL—REVIEW—INSTRUCTIONS. Instructions are not to be reviewed as though standing alone, and are not erroneous if when read with the entire charge the jury were not misled.

CRIMINAL LAW—EVIDENCE—DECLARATION OF CONSPIRATOR.   In a prosecution of two persons in which there was sufficient evidence that they were acting in concert with a common criminal design, evidence is admissible of a conversation between the prosecuting witness and one of the defendants when the other was not present.

CRIMINAL LAW—INSTRUCTIONS—FLIGHT. An instruction that flight was a material circumstance to be weighed and considered by the jury in connection with all other facts, that the term flight means that there had been a departure from the defendant's abode at the time of the crime due to fear, that it was for the jury to determine whether defendant's departure constituted flight, and if they believed there was a flight, then such fact tends to prove guilt, and must be given such weight as the jury should believe it entitled to, is not, when taken as a whole, objectionable as failing to tell the jury that evidence of flight is not sufficient in itself to establish guilt; since the jury must have understood that it was not.

[1]Reported in 133 Pac. 1014.

Appeal from a judgment of the superior court for Snohomish county, Bell, J., entered May 4, 1912, upon a trial and conviction of grand larceny. Affirmed.

*Morris & Shipley* and *Hulbert & Husted,* for appellant.

*Ralph C. Bell* and *O. T. Webb,* for respondent.

MAIN, J.—The defendant, together with Florence Pettit, his wife, were charged by information with the crime of grand larceny. The information, so far as material at present, was as follows:

"On or about the 2d day of January, 1912, in the county of Snohomish, state of Washington, the said defendant, C. M. Pettit, and the said defendant, Florence Pettit, then and there being, did unlawfully, and with intent to deprive and defraud the owner thereof, obtain from one Hattie Martin the sum of twenty-nine hundred dollars ($2,900), in lawful money of the United States of America, of the value of twenty-nine hundred dollars ($2,900), in lawful money of the United States of America, the personal property of said Hattie Martin, then and there in the lawful care, custody, possession and control of said Hattie Martin, by color and aid of the false representations and pretenses by said defendant, C. M. Pettit, and said defendant, Florence Pettit, then there knowingly, intentionally and fraudulently made, that creditors of one Oscar Martin were about to subject and seize and would subject and seize said personal property and money in satisfaction of claims against said Oscar Martin, and that it was essential and necessary in order to save, preserve and protect said personal property and money to said Hattie Martin that the same should be placed in the care, custody, possession and control of them, said defendant C. M. Pettit, and said defendant, Florence Pettit; all of which false representations and pretenses so knowingly, intentionally and fraudulently made by said defendant, C. M. Pettit, and said defendant, Florence Pettit, were believed by said Hattie Martin, who, relying thereon and being deceived thereby and induced thereby so to do, did then and there deliver, pay and surrender said personal property and money aforesaid to said defendant, C. M. Pettit, and said defendant, Florence Pettit, and the said defendant, C. M. Pettit, and said de-

fendant, Florence Pettit, did then and there receive and obtain said personal property and money aforesaid, with the understanding and agreement then and there had between said Hattie Martin and said defendant, C. M. Pettit, and said defendant, Florence Pettit, that they, the said defendant, C. M. Pettit, and the said defendant, Florence Pettit, would safely hold, keep and preserve said personal property and money for said owner thereof as bailees and trustees thereof; and they, the said defendant, C. M. Pettit, and said defendant, Florence Pettit, having then and there received and obtained said personal property and money as aforesaid, did then and there unlawfully and with intent to deprive and defraud the said owner thereof, secrete, withhold and appropriate said personal property and money to their own use and to the use of some person or persons unknown to your informant other than the true owner thereof and the person entitled thereto, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Washington."

To this information a demurrer was interposed upon various grounds, but chiefly upon the ground that two crimes are charged. The demurrer was by the court overruled. The defendant pleaded not guilty. A separate trial being granted to C. M. Pettit, on April 3, 1912, the cause was tried before the court and a jury. At the opening of the trial, the defendant moved the court for an order requiring the state to elect upon which of the two offenses alleged to be charged in the information it would proceed; that is, whether the defendant was to be tried for the alleged crime of larceny by color or aid, etc., as defined in subd. 2, Rem. & Bal. Code, § 2601 (P. C. 135 § 695), or for larceny by bailee or trustee, as defined in subd. 3 of the same section. This motion was denied. During his closing argument to the jury, the prosecuting attorney stated that he did not expect a conviction under the first form of crime as charged in the information, it not being intended for that purpose. Thereupon the defendant moved the court for an order withdrawing from the consideration of the jury all the evidence ad-

mitted during the trial in support thereof, and that the jury be instructed to disregard the same. The motion was denied. The defendant was found guilty by the verdict of the jury. Motion for a new trial and motion in arrest of judgment being made in due time, both were overruled. Thereupon sentence was imposed. The defendant appeals.

The evidence in behalf of the state tends to prove substantially the following facts: During the months of August and September, in the year 1911, Hattie Martin, the complaining witness, and her husband, Oscar Martin, first became acquainted with the defendants C. M. Pettit and Florence Pettit, his wife. The Martins and the Pettits were at that time living in houses adjacent to each other in the city of Everett, Washington. Sometime thereafter the Martins rented and moved into the upstairs rooms in the house then occupied by the Pettits. On December 4, 1911, the Martins sold the moving picture business which they for a year prior thereto had been operating. As a part of the proceeds of this transaction, there came into the possession of Mrs. Martin the sum of $3,197. This she deposited in her own name in the Everett Trust & Savings Bank. About this time Mr. Martin was advised of court proceedings which had been begun against him in Minnesota to subject certain real estate which he there owned to the payment of a debt. Whether at this time there were creditors in Everett demanding payment of claims against the Martins was a disputed question upon the trial.

On December 15, 1911, Mr. Martin departed from Everett for Minnesota. As soon as Mrs. Pettit knew that Mr. Martin was going east, she represented that Mr. Pettit and his father had said that Mrs. Martin should not leave her money in the bank. On account of the proceedings which had been instituted it was not safe. Influenced by what was said and the advice so received, she endorsed the draft which the bank had issued to her and delivered it to Mrs. Pettit, who obtained the money from the bank and brought it to the

house. The money when delivered to Mrs. Pettit was, by the teller at the bank, wrapped in a newspaper. Upon arriving at the house, the money was not counted, but the unopened package was, by Mrs. Pettit in the presence of Mrs. Martin, deposited behind the bookcase for safe-keeping. The next morning, the two women being uneasy about the money, the question of its disposition was discussed, and Mrs. Martin said that she would put it back in the bank from whence it had been taken. Mrs. Pettit thereupon advised her that it would be unsafe to do so, and stated that she would take the money and deposit it in her (Mrs. Pettit's) maiden name in the Bank of Commerce. After some protest, Mrs. Martin consented to this arrangement. When Mrs. Pettit returned from the bank she handed Mrs. Martin a draft for $3,000, who protested that some mistake had been made by one of the banks, as the amount should have been $3,197. She thereupon commenced to get ready to go to the bank in order to have the discrepancy rectified. While she was thus engaged, Mrs. Pettit departed from the room, but soon returned with a newspaper crumpled up which she pretended she was going to put into the stove. Before she did so, Mrs. Martin turned around and Mrs. Pettit gave the paper a little shake, and bills to the amount of $97 dropped upon the floor. Mrs. Pettit then pretended that she had been about to accidentally burn the money, and stated that if she had done so Mrs. Martin would have thought that she had stolen it. Mrs. Martin, however, protested that this would not have been the case, and assured her that she would trust her with anything she had. Mrs. Martin took the $97, and the discrepancy of the additional $100 was apparently not then thought of.

A few days later, Mrs. Martin went to the bank, drew out $55 and deposited the remaining $2,945 in her own maiden name. Thereafter Mrs. Pettit asked her concerning whether she had left the money deposited in Mrs. Pettit's name, and upon being told that she had not, Mrs. Pettit protested that

she should have done so, and told her that it was a great risk to do as she had done, and that Mr. Pettit had said that she should not so keep the money. Mrs. Martin, however, assured Mrs. Pettit that she was not worried about the money; that she thought it as safe in her maiden name as in Mrs. Pettit's. The matter was not mentioned again for a few days, when Mrs. Pettit came in one morning and stated that she had a presentiment that the money was attached. Mrs. Martin assured Mrs. Pettit that she did not think there was any cause for alarm and that she would not pay any attention to it. A few days later, Mrs. Pettit again approached Mrs. Martin and told her that Mr. Pettit and she had devised a way to put the money so that it would be perfectly safe. Upon inquiry as to how this was to be done, Mrs. Pettit stated that they would put it in note form. Mrs. Martin then assured her that it would be only a few days until her husband would return from the east and that she thought that the money would be all right until then, and until they got ready to leave for California shortly thereafter. Mrs. Pettit advised Mrs. Martin that she must not so leave it, and further stated that she intended to see that the money was safe before she left on a contemplated visit which she had informed Mrs. Martin she was about to make.

On the morning of January 2, 1912, Mrs. Pettit came into Mrs. Martin's room and stated that she and Mr. Pettit were going to put the money in the form of a note. After some protest on the part of Mrs. Martin, she stated that she knew nothing about notes, but that if they insisted she would permit it to be put into note form. The defendant was thereupon sent after some blank forms of notes. In the meantime, Mrs. Martin indorsed the deposit slip issued to her by the bank, and Mrs. Pettit took it to the bank and brought the money to the house. The defendant, having returned with the blank forms, at the suggestion of Mrs. Pettit sat down and filled out the note, which was the ordinary form, for the sum of $2,900, dated January 2, 1912, payable ten days

after date to the order of Hattie Martin, with interest at six per cent from January 2, 1912, payable "semi-yearly." At the bottom of the note on the due date line was filled in "Jan. 2, 1913." A line was struck through "6%" and "Jan. 2, 1912" (the rate of interest and the date from when the interest was payable), in the body of the note. The defendant signed the note, and, at his request, Mrs. Martin signed her name under his signature, he stating that this was necessary to show that the money belonged to her. Of the $2,945 which had been brought from the bank Mr. Pettit took $2,900. He stated that Mrs. Martin might need the $45 remaining, and insisted upon her keeping it, which she did. Mrs. Martin took the note, read it and kept it. She asked the defendant where he was going to put the money, and he stated that he would put it in the First National Bank of Everett, and that all Mrs. Martin would have to do would be to take the note to the bank any day and her money would be there; that she could cash the note in California, or any place.

That same day the defendant left Everett for Seattle, stating that he would return the following Saturday. His father received a letter from him written at Seattle, in which he stated that he was going to Bremerton to see about getting some work there. After returning from Bremerton, he went to Kent, then returned to Seattle, and on January 4, 1912, left by rail for San Diego, California; a few days later he went to Los Angeles. No communication of any kind was received from him by his wife or father advising them that he was going to San Diego. To Mrs. Martin, Mrs. Pettit evinced great anxiety at not hearing from her husband, she stating that she feared he had met with foul play, or that he had left her. On January 11, 1912, she left for Seattle, stating to Mrs. Martin that she expected to return the next day. She had, however, prior to leaving for Seattle, packed her trunks and engaged passage by boat for Los Angeles. She departed from Seattle on January 11, 1912, arriving in due course at Redondo, the harbor situated about 35 miles

from Los Angeles.  Here she was met by the defendant.  Mrs. Pettit not returning from Seattle as she had stated that she would, Mrs. Martin talked with the father of defendant, who informed her that Mrs. Pettit had gone to California, and he expressed surprise that Mrs. Pettit had not informed her where she was in fact going.

On January 8, 1912, Mrs. Martin took the note to the First National Bank, where the defendant had said he would leave the money, and left it with the collection teller, who asked her if she wished it put to her credit, to which she replied that she did.  Upon being asked if she wanted any money, she replied, "No, not now."  She inferred from the conversation had with the collection teller that the money was in the bank.  On January 13, 1912, she presented the receipt which the teller had given her for the note and demanded some money, and it was then that she was informed that there was no money in the bank for her; that it had not been left there by the defendant.  Thereafter, and on February 15, 1912, the defendant and his wife were taken into custody at Los Angeles, California, by the sheriff of Snohomish county, they having theretofore been arrested upon the charge contained in the information in this case.  After their arrest, Mr. Pettit turned over to the sheriff $2,400 of the identical money that he had received from Mrs. Martin, $500 having been used by the defendant.  The facts as above stated were in many particulars disputed by the defendant's evidence.  The defendant also introduced evidence explanatory of the transactions, which, if true, were consistent with innocence and inconsistent with guilt.  A further view of the evidence, however, would serve no useful purpose, for the reason that the jury evidently believed the facts to be as contended for by the state.  These, then, upon this appeal, must be accepted as the facts in the case.

The questions to be determined are:  (1) does the information charge more than one crime;  (2) was it error to submit to the jury the two means by which the alleged crime might

be committed; (3) did the instructions of the court submit to the jury false pretenses other than those charged; (4) did the evidence show concert of action sufficient to charge the defendant with statements made by his wife; (5) did the court correctly instruct on the matter of flight; and (6) was error committed in ruling upon the admissibility of evidence.

I. It is argued that the information charges more than one crime, and therefore offends against the statutory mandates. Rem. & Bal. Code, § 2057 (P. C. 135 § 1019), requires that the information be direct and certain as regards the party charged, the crime charged, and the particular circumstances of the crime when they are necessary to constitute a complete crime. Section 2059 (P. C. 135 § 1023), requires that the information must charge but one crime and in one form only, except that where the crime may be committed by the use of different means, the information may allege the means in the alternative. Section 2601 (P. C. 135 § 695), being a section of the criminal code of 1909, defines the crime of larceny, and in its subdivisions specifies varying ways in which such crime may be committed. Giving consideration to the language of this statute, it appears that the legislature therein intended to define but one crime, that of larceny, and to state the different ways in which the crime might be committed.

The information charges the crime with which the defendant is charged, with having been committed in two of the ways specified in the statute, (1) by color and aid of false and fraudulent representations, and (2) by a bailee or trustee. Does this manner of charging the crime conform to the legislative enactments? The general rule is that, where a single offense may be committed in different ways or by different means, it may be charged in the information to have been committed by more than one of the ways or means, provided the ways or means charged be not repugnant to each other. In *State v. O'Neil*, 51 Kan. 651, 33 Pac. 287, 24 L. R. A. 555, it is said, quoting from Bishop's Criminal Procedure:

"We have seen that, if an offense may be committed by different means, and the pleader doubts which was employed in the particular instance, he may in one count charge its commission by all, and proof of any one will sustain the allegation. The limit to this doctrine is, that the means must not be repugnant."

To the same effect see 22 Cyc. 379, and cases there cited.

The varying ways by which a crime may be committed are not repugnant to each other unless the proof of one will disprove the other. The defendant here was charged with having committed the crime of larceny by color and aid of false pretenses, and also as bailee or trustee. The proof that the crime was committed by color and aid would not necessarily be inconsistent with proof that, under an agreement with the parties subsequently made, the defendant became a bailee or trustee. Neither would proof that tended to establish that the alleged crime had been committed by a bailee or trustee necessarily disprove a charge that the possession of the property had been originally obtained by color and aid of false or fraudulent pretenses. The case of *People v. Kane*, 43 App. Div. 472, 61 N. Y. Supp. 195, cited and relied upon by the appellant, is distinguishable from the present case in that there there was a repugnancy, because the proof establishing one of the crimes charged disproved the possibility of the other. Some contention is made that, inasmuch as the statute connects the different means by which the crime may be committed with the disjunctive "or," they cannot be joined in the information by the conjunction "and." But this position does not appear to be sustained by the authorities. In 1 Bishop's New Criminal Procedure (2d ed.), § 436, it is said:

"A statute often makes punishable the doing of one thing *or* another, *or* another, sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the things. Therefore the indictment on such a statute may allege, in a single count,

that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has "or," and it will not be double, and it will be established at the trial by proof of any one of them."

We think the information is direct and certain, and charges, in ordinary and concise language, but a single crime.

II. The court in submitting the case to the jury defined the two means by which it was alleged that the crime had been committed, and the jury were told that if they found either to be established by the evidence, they might return a verdict of guilty. It is argued that this was error because (1) it was permitting the jury to deliberate upon either of two crimes and return a verdict according to their findings upon the evidence. The answer to this contention is found in what has previously been said; for if the information were properly drawn, it was not error to cover it by the instructions. (2) There was no evidence that the crime had been committed in the first manner charged, that is, by color and aid. An examination of the record, however, discloses that there was sufficient evidence to carry this question to the jury. And (3) the court refused to withdraw from the consideration of the jury the first form of crime charged, after the prosecuting attorney in his closing argument had stated that a conviction upon that was not expected. In this we think that the court committed no error. If, in his opinion, there was sufficient evidence of that means of the commission of the crime to sustain a conviction, it was his duty to submit it to the jury. The court was not controlled by the attitude of the prosecuting attorney.

III. Our attention is called to two instructions of the court wherein it is claimed that, under the language there used, the jury were authorized to convict the defendant in the event that they should find that *any* false representations were made, whether they be those charged in the information, or different from the ones charged. If the two instructions complained of stood alone, there might be merit in this con-

tention. But when these instructions are read in connection
with the entire charge, it does not seem that the jury could
have been misled thereby. When the instructions are read in
their entirety, it appears clear that the court was submitting
to the jury, not whether the defendant made *any* false repre-
sentations, but whether he made those that were charged in
the information.

IV. Complaint is also made of the instructions wherein
the jury were told that if they believed the false representa-
tions made by Anna Florence Pettit, the wife of the defend-
ant on trial, they might return a verdict of guilty. But
these instructions do not violate the well settled rule in this
state that, where there is a prosecution of two persons, evi-
dence of a conversation between the prosecuting witness and
one of the defendants when the other was not present is ad-
missible if the facts show a concert of action and that both
defendants were parties to the crime, even though the de-
fendants had elected to have separate trials. *State v. Will-
iams*, 62 Wash. 286, 113 Pac. 780; *State v. Baker*, 69 Wash.
589, 125 Pac. 1016; *State v. Andrews*, 71 Wash. 181, 127
Pac. 1102. There is sufficient evidence that the defendant
and his wife were acting in concert with a common criminal
design to make the declarations of the wife admissible in evi-
dence as against her husband, the defendant. Where con-
cert of action is shown, every party thereto becomes a party
to the previous as well as the subsequent acts of others in
furtherance of the common design. In 1 Greenleaf on Evi-
dence (16th ed.), § 184a, it is said:

"Every one who does enter into a common purpose or de-
sign is generally deemed, in law, a party to every act which
had before been done by the others and a party to every act
which may afterwards be done by any of the others in fur-
therance of such common design."

V. Error is predicated upon the instruction given upon
the question of flight. This instruction was in substance as
follows: That flight was a material fact and circumstance

to be weighed and considered by the jury in connection with all the other facts and circumstances in determining the defendant's guilt or innocence; that the term flight, as used in the instruction, meant that there had been a departure from the defendant's residence or abode at the time the crime was alleged to have been committed, which was due in some degree to fear of arrest or consciousness of guilt; that the undisputed fact was that the defendant had departed from his residence in Snohomish county and was arrested at a later date in the state of California; that it was for the jury to determine from all the evidence whether such departure constituted flight as that term was defined in the instruction; that if the jury believed there was a flight on the part of the defendant, then such fact and circumstance tends to prove guilt, and must be given such weight and effect in favor of guilt as the fair and honest judgment of the jury should believe it entitled to. The law is that evidence of flight is insufficient in itself to establish guilt, but may be taken into consideration with all the other facts and circumstances of the case in determining whether or not the person charged with crime is in fact guilty. *State v. Stentz*, 33 Wash. 444, 74 Pac. 588. To constitute flight it is not necessary that there should be an escape from jail or from an officer, but it may consist in a departure from the place of the crime by one conscious of guilt, even before suspected of the crime. In *State v. Deatherage*, 35 Wash. 326, 77 Pac. 504, it is said:

"It is not necessary, in order to prove the flight of one charged with crime, to show that he escaped from jail or from an officer having him in custody, for it often happens that persons conscious of guilt seek safety by flight, even before they are suspected of crime. 'The wicked flee when no man pursueth.' "

The concluding part of the instruction, which in effect told the jury that if they found there was a flight on the part of the defendant, such was a fact or circumstance that

tended to prove guilt and should be given such weight and effect as the jury thought it fairly entitled to, states a proposition which the authorities support.    In *George v. State,* 61 Neb. 669, 85 N. W. 840, it is said:

"Objection is further made because evidence was admitted as to the acts of the defendant in leaving the place where he had been staying soon after the commission of the alleged crime, and going to another part of the state, apparently to escape arrest and prosecution.    This evidence was proper, and to be considered by the jury, to be given such weight only as they thought it entitled to in view of all the other facts and circumstances of the case."

In the first part of the instruction, it is stated that flight is a fact or circumstance which the jury may take into consideration in connection with all the other facts and circumstances in determining the defendant's guilt or innocence. It is true that the instruction in no place in express language tells the jury that evidence of flight is not sufficient in itself to establish guilt.    But when the instruction is read as a whole, it seems clear that the jury must have understood that flight was not sufficient in itself, but that it was to be taken into consideration with all the other facts and circumstances of the case, and given such weight as the jury might think it entitled to.

VI.    Finally, it is urged that the court erred in ruling upon the admissibility of evidence.    But in this regard we think that the record discloses no prejudicial error.

The judgment will be affirmed.

ELLIS, FULLERTON, and MORRIS, JJ., concur.