[Crim. No. 1463. Third Appellate District.—May 19, 1936.]

THE PEOPLE, Respondent, v. ROBERT J. FITZGERALD et al., Appellants.

Faulkner & O'Connor, Fowler & Fowler, Leo Collins and Griffin & Boone for Appellants.

U. S. Webb, Attorney-General, Ralph H. Cowing, Deputy Attorney-General, Leslie A. Cleary, District Attorney, and Glenn M. DeVore for Respondent.

TUTTLE, J., *pro tem.*—Appellants were found guilty by a jury of malicious and reckless possession of dynamite as that crime is defined in section 6, Act 2433, General Laws of California. They now appeal from the judgment, order denying motion for new trial, and order denying motion in arrest of judgment.

No appeal lies from an order denying a motion in arrest of judgment, and such appeal will therefore be dismissed. (*People* v. *Bundy*, 168 Cal. 777 [145 Pac. 537].)

The facts, as disclosed by the evidence produced by the prosecution, and also certain undisputed facts, are stated in the following paragraphs:

During the months of March and April, 1935, there existed on the Pacific Coast a strike which involved various oil companies operating oil tankers and their maritime employees, members of certain maritime unions. This strike was commonly referred to as "The Tankers Strike". The various maritime unions, consisting of The Sailors' Union of the Pacific, The Pacific Coast Marine Firemen, Oilers, Wipers &

Water-Tenders, The Marine Cooks and Stewards Association, The Marine Engineers Benevolent Association, and The Pacific Coast District Masters, Mates and Pilots, formed what was known as "The Joint Tankers Strike Committee and Negotiations Committee". These various unions appointed members of the joint tankers strike committee and of a negotiations committee, the purpose of which latter committee was to meet with the mediation board appointed by the President of the United States for the purpose of adjusting the differences between the employers and the employees.

While the strike was in progress, and as early as about the 1st of April, 1935, the Standard Oil Company was recruiting and concentrating strike-breakers to be used on its oil tankers at Patterson and at the town of Westley, both in the county of Stanislaus, state of California. Said strike breakers were housed in the town of Patterson in a hotel known as the Del Puerta Hotel.

During this period, although other oil companies were involved in the strike, the Standard Oil Company was the company most particularly affected in this, that the unions had declared a boycott on all Standard Oil products.

On April 3, 1935, Donald W. Cobble, a member of the Marine Engineers Benevolent Association, one of the unions on strike, received a letter from his wife, who was a waitress in the Del Puerta Hotel at Patterson, California, stating that strike breakers were housed in the said hotel. This letter Cobble took to union headquarters and delivered to a Mr. Merriweather, an officer of the union. On the night of April 10, 1935, two of the defendants, Buyle and Rodger, met one George Brazelton, and his wife, Helen Brazelton, at the Mohawk restaurant, situate at No. 40 Commercial Street, in the city of San Francisco. They arranged to take Helen Brazelton with them on a trip to Marin County. On this trip they went to the Daniels quarry, a few miles from San Rafael, and there they entered a powder magazine and a locked box and stole a quantity of dynamite, fuses and caps, and two cans of black powder. They returned to San Francisco and to the apartment of George and Helen Brazelton, and asked George Brazelton if they could store the "soup" there. During all of the times mentioned, Cobble and defendants Rodger and Buyle were members of unions conducting the strike mentioned.

James Scrudder, at the time employed as a longshoreman, and also previously employed as a special police officer by the San Francisco police department, met the defendant Buyle on the street on the morning of April 11th, and was told by Buyle that he and Rodger had gotten sufficient "stuff" the night before to blow up the town. On the 11th day of April, Scrudder communicated with the crime prevention bureau of the San Francisco police department, commanded by Captain George Healy, and was instructed to look out for the dynamite. Between the 10th and 20th of April, Scrudder contacted all of the appellants in this case at various times, with the exception of the appellants Silva, Burrows and Sousa. He told the appellant Rodger that he had a car which could be used if it became necessary at any time.

On the 20th of April, 1935, in the morning, Scrudder met Stanfield and Ciambrelli, two of the appellants herein, who were looking for Rodger and Buyle, stating that they had a party on for that night and that the party involved a letter which had been written by some engineer's wife, relative to the place in the country where they were housing nonunion sailors, and that they were going "to dump the finks". Later, at the Mohawk Restaurant, Scrudder was present when Stanfield, Ciambrelli, Rodger and Buyle discussed the party that was to take place that night. On this same day defendant Stanfield called at the union headquarters and secured from Merriweather, a union official, funds to defray the expenses of the trip to Patterson.

Some time before 7 o'clock that evening the defendant Rodger called Scrudder on the phone and asked him if his car was all right, so that it would not stall on the highway, and directed him to be at the Mohawk Restaurant not later than 7 o'clock. When Scrudder got to the Mohawk Restaurant on the night of April 20th, all of the appellants, together with Hal Marchant, were there waiting for Rodger. When Scrudder asked where Rodger was, he was told that Rodger had gone to get the "groceries", the "soup", the dynamite. Shortly afterwards Rodger returned to the Mohawk and had with him a package of twelve sticks of dynamite, some fuses and fulminate caps, which he proposed to put in Scrudder's car. Scrudder declined to take the package in his car, and insisted that it be divided, and the dynamite was divided on the running board of the Chrysler car in the presence of all

of the appellants herein, and Marchant and Scrudder, and six sticks were put in the Chrysler car belonging to Rodger, and six were taken into the Nash car by the appellant Fitzgerald, he sitting in the rear seat of that car. The party then started for Patterson, traveling south to San Mateo and over the San Mateo bridge, stopping for gas, and arriving at Tracy, where the cars became separated.

Before leaving San Francisco Scrudder reached a telephone and telephoned to Officer Harry Majors, of the San Francisco police department, crime prevention bureau. Meanwhile, at the Del Puerta Hotel at Patterson, John M. Sayers, a special agent of the Standard Oil Company, in charge of the guards, had received a telephone call giving an automobile license number which was that of Scrudder's car. He communicated with the sheriff of Stanislaus County, who, with the undersheriff, proceeded to Patterson. There he remained until the episode of the arrests as hereinafter related.

The appellant Rodger, driving his Chrysler car, in which were also riding the appellants Silva and Ciambrelli, in the front seat, and Stanfield and Johnson in the rumble seat, drove into Patterson, passed around the circle in front of the Del Puerta Hotel, and identified it, passed through other streets of the town of Patterson, and back out on the highway toward the north, where they stopped at a point near K Street, on the side of the highway.

Alfred B. Hughel and Sidney E. Lewis, employees of a private detective agency, then in the employ of the Standard Oil Company, had been directed to station themselves near the town of Westley, which is about six miles north of Patterson, and to look for the license number of the car of Scrudder. This direction had been given to them by John M. Sayers, hereinbefore described.

These men observed the Chrysler car pass through Westley, and after waiting a short time, they observed the Nash car of Scrudder pass. They followed this car toward Patterson and observed that it tried to elude them by speeding up, and finally by shutting off all its lights and passing into a side road. They went on into the town of Patterson and gave the alarm, and that the license number which they were looking for had arrived. They then went back north on the highway to the point where the Chrysler car was stopped,

got from their car armed, and ordered the persons therein, namely, Rodger, Ciambrelli, Silva, Johnson and Stanfield, to alight. Immediately, two other cars containing city and county officers and guards of the Standard Oil Company appeared on the scene. In one of these cars was Chief of Police Busengdal, Constable Kirk, and Night Officer Silva, of Patterson. In the other car were R. S. Swartz, Frank Jewett and a man named Stimpson, all of whom were employed by the Standard Oil Company, either directly or through an agency. Hughel and Lewis, together with a man by the name of Lewis, also a guard for the Standard Oil Company, then left the Chrysler car in charge of the officers who had arrived, and proceeded north on the highway until they passed the Nash car of Scrudder, coming slowly towards Patterson. They then turned around and followed the Nash car to the point where the Chrysler car was stopped, and they there stopped the Nash car. In the meantime, Sheriff Hogan, Undersheriff Wright, and John Sayers had arrived from Patterson, driven north to Westley and back to the scene where the cars were stopped at a very high rate of speed. After they arrived, Swartz and Jewett began a search of the Chrysler car, Undersheriff Wright being present at all times, and they found six sticks of dynamite just behind the front seat of the Chrysler car, a roll of fuse on the floor in the rumble seat, one piece of which had a fulminate cap, attached, a blackjack sticking in the side pocket of the car, and another stuck behind the cushion on the opposite side of the car.

Fitzgerald, riding in the rear seat of the Nash car, was told to throw out the dynamite, by someone riding in the front seat of the Nash car, just as they approached the spot where the other car had been stopped. He replied that it had been thrown out. The next morning, at about daybreak, Hughel and Davis found six sticks of dynamite, two pieces of fuse, one with a cap on, alongside the road where the Nash car had traveled in the last two hundred or three hundred feet of its path before it stopped. The appellants were arrested and taken to Modesto, and Scrudder and Marchant were released.

All appellants, and also Buyle and Marchant, were indicted by the grand jury. The latter two were not tried with appellants, and, of course, are not parties to this appeal. The

indictment contained five counts,—a conspiracy to dynamite a hotel; conspiracy to assault with deadly weapons; reckless and malicious possession of dynamite; knowingly and maliciously having in their possession, dynamite; and possession of blackjacks and billies.

The indictment against Marchant was dismissed before trial, and the fourth count of the indictment dismissed against all defendants. Defendants were found not guilty on counts one, two and five, and guilty on count three, with a recommendation for leniency. Appellant Patsy Ciambrelli was sentenced to Folsom state prison, and the remainder of appellants were sentenced to San Quentin prison. The defendants were found guilty, under count three of the indictment, of reckless and malicious possession of dynamite. This offense is defined by sections 5 and 6, California Statutes 1887, page 110, General Laws, Act 2433, which read as follows:

"5. *Prohibiting reckless possession of explosives.*

"Any person who, in the public street or any highway of any county, city and county, or town or city, or at, in or near to any theater, hall, public or private school, or college, church, hotel, or other public building, or at, in, or near to any private habitation, or in, on board of, or near any railway passenger train, or car or train, or cable road, or car of the same, or steam or other vessel, engaged in carrying passengers, or ferryboat, or other public place where human beings ordinarily pass and repass, shall recklessly or maliciously have in his or her possession any dynamite, nitroglycerine, vigorite, hercules powder, giant powder, or other high explosive; or who shall recklessly or maliciously by use of such means intimidate, terrify, or endanger any human being is guilty of a felony, and on conviction shall be punished accordingly.

"6. *Defining reckless possession.*

"Any person not regularly engaged in the manufacture, sale, transportation or legitimate use in blasting operations, or in the arts, of such substances as are named in this act, shall be presumed (*prima facie*) to be guilty of a reckless and malicious possession thereof, within the meaning of the foregoing section, if any such substance is found upon him, or in his possession, in any of the places, or under any of the circumstances specified in the preceding section."

Said count three of the indictment is in words and figures as follows, to wit:

"Count Three.

"The Grand Jury of the County of Stanislaus, State of California, by this indictment found this 5th day of June, 1935, hereby accuses Robert J. Fitzgerald, Reuel Stanfield, Victor H. Johnson, Patsy Ciambrelli, Alphons Buyle, John Sousa, John Rodger, Henry Silva, John Burrows, and Hal Marchant, of the crime of felony, to-wit: reckless possession of explosives, committed as follows, namely: that said above named defendants did on or about the 20th day of April, 1935, at and in the said County of Stanislaus, State of California, recklessly and maliciously have in their possession in a public highway in the County of Stanislaus, State of California, namely, the public highway leading from the town of Patterson to the northern boundary of the County of Stanislaus, and in a place where human beings ordinarily pass and repass, namely, said public highway above described, a certain quantity of dynamite, fuses and caps, to-wit: 12 sticks of dynamite, 2 lengths of fuse and 2 copper caps."

It is the contention of the defendants and appellants that sections, *supra,* making the possession of explosive substances an offense embodying recklessness and maliciousness are unconstitutional under the Fourteenth Amendment of the Constitution of the United States and under article 1, sections 13 and 21 of the Constitution of the state of California, in that said sections deny the defendants due process of law, the equal protection of law, and further, that defendants' constitutional and statutory right to a presumption of innocence in their favor is violated.

It is conceded by appellants that "it is competent for a legislative body to provide by statute or ordinance that proof of certain facts shall be *prima facie* presumptive evidence of other facts, if there is a natural and rational evidentiary relation between the facts proved and those presumed; such statutes or ordinances are within the well-settled power of a legislature to change the rules of evidence and do not infringe upon the rights of the judiciary nor violate the provisions of the federal or state Constitutions".

The foregoing is a correct statement of the general rule throughout the United States, including our own state. It is succinctly set forth in *Mobile J. & K. C. R. Co.* v. *Turnipseed,*

219 U. S. 35 [31 Sup. Ct. 136, 55 L. Ed. 78, Ann. Cas. 1912A, 463, 32 L. R. A. (N. S.) 226], as follows: "The law of evidence is full of presumptions either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded. Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, national and state, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. Every accused person, of course, enters upon his trial clothed with the presumption of innocence. But that presumption may be overcome, not only by direct proof, but, in many cases, when the facts standing alone are not enough, by the additional weight of a countervailing legislative presumption. If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent, it is no more than happens in respect of a great variety of presumptions not resting upon statute." (*Yee Hem* v. *United States,* 268 U. S. 178 [45 Sup. Ct. 470, 69 L. Ed. 904].) The same rule prevails in California. (*People* v. *Osaki,* 209 Cal. 169 [286 Pac. 1025]; *People* v. *Cockrill,* 62 Cal. App. 22 [216 Pac. 78].)

■ This rule is subject to certain qualifications. "A *prima facie* presumption casts upon the person against whom it is applied the duty of going forward with his evidence on the particular point to which the presumption relates. A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the Fourteenth Amendment. . . . It is not within the province of the legislature to declare an individual guilty or presumptively guilty of crime. . . . State legislation declaring that proof of one fact shall constitute *prima facie* evidence of the main or ultimate fact in issue is valid if there is a rational connection between what is proved and what is to be inferred. If the presumption is not unreasonable and is not made conclusive of the rights of the person against whom it is raised, it does not constitute a denial of due process of law." (*Manley* v. *Georgia,* 279 U. S. 1 [49 Sup. Ct. 215, 217, 73 L. Ed. 575].)

It is the rule in this state that against a proved fact, or a fact admitted, a disputable presumption has no weight, but where it is undertaken to prove the fact against the presumption, it still remains with the jury to say whether or not the fact has been proven; and, if they are not satisfied with the proof offered in its support, they are at liberty to accept the evidence of the presumption. (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540 [299 Pac. 529].)

"It becomes evident," state appellants, "that defendants not only had to contradict the presumption, but to overcome the case thus made out, without any further evidence offered by the state, as a result of the statute establishing the rule of evidence under question."

From the portion of appellants' brief first quoted above, it appears that the sole question to be here considered is whether or not there is any rational connection between the fact proved and the ultimate fact presumed. Is it rational to presume that a person in possession of dynamite, and who is not regularly engaged in its manufacture, sale, transportation, or legitimate use in blasting operations, or in the arts, is guilty of reckless or malicious possession thereof? Putting the question in another manner, has the presumption created any relation in experience to the facts? (*McFarland* v. *American Sugar Ref. Co.*, 241 U. S. 79 [36 Sup. Ct. 498, 60 L. Ed. 899].) As an example of a case which admittedly would not meet this test, if the legislature should declare that every man found wearing a straw hat in September should be presumed guilty of any forgery which took place in that month, such an act would patently contravene the "due process" clause of the federal Constitution. On the other hand, if the legislature should declare that the possession of stolen goods shortly after a larceny should be *prima facie* evidence of guilt, and that the burden of rebutting the presumption rested upon the person in possession of such goods, such an enactment would be valid, the presumption not being purely arbitrary, as there is obviously a reasonable and rational connection between the possession of the stolen goods and the commission of the crime.

It may be observed that in enacting this statute the legislature in effect enumerated certain persons who might possess explosives such as dynamite for legitimate purposes, and in effect said that all others who did not come within the

classification would be presumed to possess it unlawfully. What is the nature of the article whose possession is thus restricted? "The degree of care required of persons having possession and control of dangerous explosives, such as firearms and dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them." (*Mattson* v. *Minnesota & N. W. R. Co.*, 95 Minn. 477 [104 N. W. 443, 111 Am. St. Rep. 483, 5 Ann. Cas. 498, 70 L. R. A. 503].) The same rule is found in 25 C. J., page 185, section 8. The Penal Code of this state contains *seven sections* dealing with the possession, use and transportation of dynamite.

That the possession of explosives can lead to tragic results is shown by the records of the Supreme Court, in the case of *People* v. *Mooney*, 177 Cal. 642 [171 Pac. 690], where the lives of a number of innocent persons were snuffed out by the explosion of a bomb. No person in California can purchase dynamite unless a record of the sale is made. (Pen. Code, sec. 375a.) In civil trials where damages are sought, all the plaintiff has to do is to prove that he was injured by an explosion of dynamite, which was under the control and in the possession of defendant. The proof of the explosion draws with it a presumption of negligence sufficient to establish a *prima facie* case for a recovery. (*Judson* v. *Giant Powder Co.*, 107 Cal. 549 [40 Pac. 1020, 48 Am. St. Rep. 146, 29 L. R. A. 718].) It is at once apparent that the article whose possession is here restricted, is recognized and treated by our courts and legislature as potentially dangerous and destructive, and there has been an increasing tendency, since the enactment of this statute, to further restrict and circumscribe its possession, use and transportation. The law in question was enacted in 1887, but we may reasonably assume that dynamite was just as dangerous then as it now is, and that this was known to the legislature at that time. As was stated in the Judson case: "Presumptions arise from the doctrine of probabilities. The future is measured and weighed by the past, and presumptions are created by experience of the past. What has happened in the past, under the same conditions, will probably happen in the future, and ordinary and probable results will be presumed to take place until the contrary is shown." And so the legislature had a right to assume, from the inherent dangerous qualities of dynamite,

that when it was possessed by persons who had no legitimate use for it, it was to be used for an unlawful purpose, and to provide that under such circumstances it would be presumed that a person possessing it for no legitimate purpose would possess it maliciously and recklessly. There is thus, in our opinion, a rational and evidentiary relation between the facts proved and those presumed, and consequently the Fourteenth Amendment to the federal Constitution is not contravened, and the point is without merit.

It would unduly prolong this opinion to discuss the numerous cases cited by the parties on the matter of presumptions of this character. No instance is referred to where the facts are the same, or very similar. It would appear that the question of the rational connection between the facts presumed and the facts proved must be decided according to the peculiar facts involved. We have pointed out the extreme case which would contravene the ''due process'' clause, and the case which would be patently within the Constitution. Between these two extremes we find a very large number of cases which have been the subject of adjudication. The power of the state to enact statutes of this character is unquestioned by appellants, but the limit to which such legislation can be extended must ultimately and eventually depend upon the factual structure and the subject-matter of each case, in the light of the general rule we have noted.

■ Concluding our views on this question, it would appear that the practical operation of this presumption would be as follows: Persons charged under section 5 of the act for the offense of reckless or malicious possession of dynamite, face the court at the inception of their trial with the usual presumption of innocence, and this continues throughout the trial to the conclusion thereof. Upon the production of evidence proving that they are not within the classes set forth in section 6, and that they were in possession of dynamite, the burden of going forward and producing evidence shifts to the defendants to meet the presumption that such possession was reckless or malicious. It is incumbent upon them to explain their possession, just as in a homicide charge, where the killing is proven, the burden is cast upon the defendant to explain how it happened, and unless he meets this burden to the extent of raising a reasonable doubt, the jury is justified from that proof alone in finding him guilty

of murder. (*People* v. *Rodriguez,* 182 Cal. 197 [187 Pac. 423], construing section 1105 of the Penal Code.) During the entire trial in such cases the burden of proving the defendant guilty beyond a reasonable doubt never shifts, but is always upon the prosecution. In effect, a presumption of this character may be characterized as a substitute for evidence, but it does not operate to *destroy* the presumption of innocence, though it may be weighed by the jury against such presumption. Such presumptions are to be considered by the jury in the same manner as any proven facts before it. There is nothing in the statute which would operate "to deprive defendants of a reasonable opportunity to present the pertinent facts of their defense." (*Bandini Petroleum Co.* v. *Superior Court,* 284 U. S. 8 [52 Sup. Ct. 103, 76 L. Ed. 136, 78 A. L. R. 826].) ██ Their explanation of possession of the dynamite consisted of a denial of any knowledge of the presence of such explosive, although it was found in the bottom of their automobile in one case, and was evidently thrown from the other automobile. The verdict indicates that the jury were not satisfied with such an explanation. Every opportunity was given defendants to show how they came into possession of the dynamite, and the purposes for which it was intended, but no such evidence was produced. Under such circumstances, it would seem that defendants have greatly exaggerated any prejudicial effect which might be produced by the operation of this presumption. It must be remembered that this is not a case where the conviction rested solely upon the evidentiary effect of a presumption. Disregarding entirely the effect of the presumption, there was ample evidence which would justify a finding that the defendants possessed the explosive "recklessly and maliciously". Upon the night of April 20th, when the arrest occurred, witness Scrudder testified that he went to the Mohawk Restaurant, where all defendants were assembled; that a conversation there took place in which it was said they were going to a town up country about fifty or sixty miles away, where a bunch of "finks" were housed, and that the Standard Oil Company were using that place to hide them, and that they were going to "dump" them. In the presence of all defendants the twelve sticks of dynamite and the fuse were divided into two equal portions, one being placed in each automobile. It is thus at once apparent that the evidence

afforded by the presumption was wholly supplanted by proof of actual facts. While this did not destroy the effect of the presumption as evidence, it does tend to nullify any prejudicial effect which the instructions might have upon the question of the effect of the presumption.

It is contended that section 6 of the act in question, relating to the presumption, is unconstitutional for the reason that it is not embraced within the title of the act (Const., art. VI, sec. 24). "It has been long settled that the constitutional provision requiring the subject of an act of the legislature to be expressed in the title must be liberally construed, and that all that can be required to be contained therein to meet the provision is a reasonably intelligent reference to the subject to which the legislation is addressed." (*Estate of Wellings,* 192 Cal. 506–519 [221 Pac. 628].) It is our opinion that the section in question comes within the foregoing rule, and that the statute is constitutional. We might add that the case relied upon by appellants (*People* v. *Murguia,* (Cal. App.) [42 Pac. (2d) 325]) was ordered heard in the Supreme Court, and in the final opinion of that court (6 Cal. (2d) 190 [57 Pac. (2d) 115]) no mention is made of the point under consideration.

It is urged that the act in question has been repealed by implication. This act appears in Statutes of 1887, beginning on page 110. It consists of eleven sections, all relating to the subject of explosives, except the last, which gives the effective date of the legislation. In 1905, sections 1, 2, 3 and 4 of this act were enacted into section 375a of the Penal Code, and section 8 was enacted into section 601 of the Penal Code. It is contended that this indicates a clear intention to repeal by implication the *entire Act of 1887,* dealing with explosives. It is not contended that the legislature reenacted all the sections of the statute, nor does it appear that the new legislation dealt with the malicious or reckless possession of dynamite as an offense. "The repeal of statutes by implication is not favored." (*Merrill* v. *Gorham,* 6 Cal. 41, 42; *Hilton* v. *Curry,* 124 Cal. 84, 87 [56 Pac. 784]; *Traber* v. *Railroad Commission,* 183 Cal. 304 [191 Pac. 366, 369].) It is the rule that "if the later statute does not cover the entire field of the first, and fails to embrace within its terms a material part of the first, it will not repeal so much of the first as is not included within its scope". (59 C. J., p. 921.)

Under the rule stated, we hold that there was no repeal of the statute by implication, as there is no indication of any intention upon the part of the legislature to accomplish this purpose. Appellant relies upon *Mack* v. *Jastro,* 126 Cal. 130 [58 Pac. 372]. The rule there set forth is that "whenever it becomes apparent that a later statute is revisory of the entire matter of an earlier statute, and is designed as a substitute for it, the later statute will prevail and the earlier statute will be held to have been superseded, even though there be found no inconsistencies or repugnancies between the two". In the instant case, however, the legislature never attempted to revise the entire matter connected with explosives. It merely took several provisions of the old statutes and reenacted them, leaving the others intact. There was no intention of reenacting another statute dealing with the *entire subject-matter*. The title of the subsequent legislation does not so indicate or even intimate. The rule quoted from Corpus Juris is therefore applicable and determinative of the question.

▇ It is next contended that the evidence is insufficient to sustain the verdict in two particulars: That the testimony of accomplices is not sufficiently corroborated; and that it was not proven that defendants were never engaged in dynamite business. As to the first point it appears beyond question from the record before us that the jury was justified in finding that Marchant and Scrudder were not ordinary accomplices, but were feigned accomplices. There is evidence showing that witness Scrudder was acting, at the time of the alleged offense, as a member of the San Francisco police department, under the direction of Captain Healy and was in communication with that department during all the time covered by the evidence; that witness Scrudder was also in the employ of Harry Majors, a patrolman under Captain Healy. The position of counsel for appellants *here* is somewhat difficult to reconcile with his attitude during the *trial,* respecting this matter. On his cross-examination of Marchant he referred to him as a "feigned accomplice". Considerable of his argument to the jury was based upon denunciation of these witnesses for their duplicity. Referring to Marchant, he said: "This man is owned, body, soul and breeches, by the Standard Oil Company." Referring to Scrudder, he said: "I called him a stool-pigeon, and he

accepted the word.'' In his argument before this court he contended that these witnesses were not feigned accomplices. In his brief filed herein counsel for appellants designates Marchant as ''the union man in the pay of his adversary''. We are free to confess that, in view of the record, we have little faith in the sincerity of this contention. There is ample evidence from which the jury could find that neither of these witnesses cooperated with defendants for an unlawful purpose, and that each was doing everything in his power to detect crime. Our conclusion is that the evidence is sufficient to justify a finding by the jury that these witnesses were feigned accomplices, and as such, their testimony required no corroboration. (*People* v. *Keseling*, 35 Cal. App. 501 [170 Pac. 627], where numerous California cases are cited in support of the rule.) ''So, also, one who feigns complicity in the commission of a crime merely for the purpose of detecting and prosecuting the perpetrators is not an accomplice.'' (8 Cal. Jur., p. 175.)

It is contended that there is no evidence which would support an implied finding that defendants were not within the classification provided in section 6 of the act; hence, the presumption did not arise. The point is without merit. The business or occupation of each defendant is found in the record. None came under the classification. This is ample to support a finding that none of defendants came under any of the classes mentioned. No pretense was ever made at the trial that any defendant did actually come within the list of those persons against whom the presumption would not operate. No such defense was made.

It is next contended that the court erred in admitting, over the objection of the defendants, certain evidence relating to the theft of the dynamite. Witness Helen Brazelton testified that on April 10th she was invited by defendant, John Rodger, and one Alphonse Buyle (both union men), to take an automobile ride to Marin County; that they drove to a quarry; that the men got out of the car and went to the quarry, returning with a package wrapped in a newspaper; that this package was afterwards unwrapped in the presence of the witness, and that it contained a number of dynamite fuses and caps; that she heard Buyle say to Rodger that they had secured thirty-five sticks of dynamite; that

these men asked witness if she would put away some "soup" for them, and she refused to do so.

From the foregoing and other evidence in the record there was ample justification for a finding by the jury that the dynamite, fuses and caps were stolen on this occasion. The objection to the admission of this evidence was based upon the ground that it involved acts which were committed prior to the formation of a conspiracy to possess dynamite maliciously or recklessly, and it was made on behalf of each defendant. As hereafter appears, this evidence was clearly admissible against one of the defendants, Rodger. It was therefore competent evidence in the case, and the trial court could not properly exclude it. The utmost the court could do would be to limit its consideration, either at the time of its admission or in its instructions. Such is the well-recognized rule, which is fully explained by the Circuit Court of Appeals, per Rudkin, Judge, in the case of *Robinson et al.* v. *United States,* 33 Fed. (2d) 238. There, five parties were tried upon a criminal conspiracy charge. Defendant Robinson contended that "the trial court erred in the admission of evidence against him, prior to any joint or other participation by him in any scheme". The court held that the assignment of error was not well taken, for the reason that, as explained above, no request for a limitation of the effect of the evidence was made at the trial. In the instant case there was no request for such limitation at any time. No instruction limiting the effect of this evidence was offered by defendants. Even in cases where the trial court has admitted evidence against one defendant, with an admonition to the jury that such evidence could not operate to bind the other defendants or in any manner or degree be considered by the jury as affecting them, it has been held that unless an instruction is offered limiting the effect of such evidence, the point cannot be urged as grounds for reversal. "It has been repeatedly held that where testimony is properly received for a specific or limited purpose, and it is important that its consideration in reaching a conclusion upon the facts should be restricted to that purpose, it is the duty of counsel representing the side against which such testimony may be supposed to militate, to ask for an instruction limiting the effect thereof to the particular purpose for which it was admitted." (*People* v. *Lichtenstein,* 22 Cal. App. 592 [135

Pac. 692, 700], citing numerous California cases.) In the instant case, appellants failed to ask for a limitation to the effect of the evidence when it was offered, and it would appear that the duty of offering an appropriate instruction was far more imperative than it was in the case last cited. Our conclusion is that defendants cannot now urge the point on this appeal. Even though the proper method had been pursued at the trial, we are of the opinion that such evidence was competent against all the defendants. It is no doubt the rule that acts of a person committed *prior to the formation of a conspiracy* are inadmissible against his subsequent conspirator. (*Morrow* v. *United States*, 11 Fed. (2d) 256.)

The first inquiry is: When was this conspiracy formed? Considering the evidence introduced by the prosecution, we find that on April 3, 1935, Donald W. Cobble, a member of one of the unions on strike, received a letter from his wife, who was a waitress at a hotel in Patterson, California, stating that strike-breakers were housed in said hotel. Cobble took this letter, the same day, to union headquarters and delivered it to Mr. Merriweather, an officer of a striking union. On April 10th, defendant, Rodger, and one Buyle, stole the dynamite as narrated by witness, Brazelton. The last parties mentioned were members of a striking union. On April 20th, the day of the trip to Patterson, defendant, Stanfield, called at the office of Merriweather in the Ferry Building where union headquarters for the strike were maintained, and Merriweather gave said defendant money to defray the expenses of the proposed trip to Patterson.

It is the rule in this state and most jurisdictions "that in proving a conspiracy it is not necessary that proof be made that the parties met and actually agreed to undertake the performance of the unlawful act, and that a conspiracy may be shown by proof of facts and circumstances sufficient to satisfy the jury of the existence of the conspiracy, leaving the weight and sufficiency of the evidence to the triers of the questions of fact". (*People* v. *Schmidt*, 33 Cal. App. 426, 444 [165 Pac. 555; 563].) "The actual fact of conspiracy may be inferred, as has been said, from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point, or collocation of independent but conspiring acts, by persons closely associated with each other, is held to be sufficient to

enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove co-operation of an individual conspirator.'' (Wharton's Criminal Law, vol. 2, sec. 1667.) The parties here are all members of striking unions. Cobble delivers the letter from his wife to union headquarters, and personally to a union official, Merriweather; a few days later members of the union steal the dynamite, fuse and caps; on the day of the offense, Merriweather hands defendant, Stanfield, money to defray the expenses of the trip to Patterson, where it was proposed to dynamite the hotel which housed the strike-breakers. With such facts before it, and other facts and circumstances disclosed by the record, and guided by the rule stated, we believe that the jury was justified in finding that the conspiracy to commit the crime was formed on or about April 3d, and not on April 20th, as contended by appellants. This conspiracy was entered into by Rodger, Buyle and Merriweather, the jury could readily infer, for the purpose of securing dynamite and transporting it to Patterson for the purpose of blowing up the hotel where strike-breakers were reported to be housed. The authorities upon the question of acts committed prior to the formation of a conspiracy are not applicable, as this evidence sought to be excluded relates to acts performed *after* the formation of the conspiracy. In any event, this evidence was admissible against the defendant, Rodger, who stole the dynamite. ▮ If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding the evidence, simply because it involves the commission of another crime. (*People* v. *Tucker*, 104 Cal. 440 [38 Pac. 195].)

In the case of *People* v. *Burke*, 18 Cal. App. 72 [122 Pac. 435], defendant was charged with the malicious use of dynamite under the provisions of section 601 of the Penal Code. The trial court admitted evidence of the fact that defendant went to his mine and secured a quantity of dynamite, and such ruling was upheld. In the instant case, evidence of the taking of the dynamite from the quarry was also admissible, although such taking was unlawful. ''Even where no relationship exists as between two offenses, if the offered evidence is pertinent to the proof of the offense charged, it

is admissible". (*People* v. *Revley,* 67 Cal. App. 553 [227 Pac. 957], citing numerous California cases.)

 Witness, Scrudder, testified that on April 20th defendants, Stanfield and Ciambrelli, talked over the fact that the dynamite was stolen. If these last two defendants had knowledge of that fact prior to the commission of the offense, they will be held to have ratified such prior act upon the part of other conspirators, and they cannot complain that such evidence was prejudicial to their defense. As to the other five defendants, it is true that there is no direct evidence showing that they had any knowledge that the dynamite was stolen. They entered the conspiracy after it was formed. The rule applicable to this situation is stated in 16 C. J., section 1307, page 656, as follows: "Where one joins a conspiracy after its formation, and actively participates in it, he adopts the previous acts and declarations of his fellow conspirators, so that such acts and declarations, although done or made before he joins the conspiracy, are admissible against him." This rule is followed in *Wishard* v. *State,* 5 Okl. Cr. 610 [115 Pac. 796, 797] , *State* v. *Crab,* 121 Mo. 554 [26 S. W. 548] , *Gilbert* v. *Commonwealth,* 228 Ky. 19 [14 S. W. (2d) 194] , *State* v. *Pettit,* 74 Wash. 510 [133 Pac. 1014], and appears to be general throughout the United States.

In *United States* v. *Logan,* 45 Fed. 872, the court, referring to a conspirator, instructed the jury that "his connection with it (the conspiracy) at any time makes him liable for all that has been done by any of his co-conspirators in pursuance of the conspiracy". This rule has definitely been adopted and applied in this state in the case of *People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555]. Defendant was charged with murder committed by explosives which wrecked the Los Angeles Times Building, and thereby killed twenty-one people. The prosecution was permitted to introduce evidence of acts done in furtherance of a conspiracy all over the United States, in connection with the use of explosives by striking labor unions. Such evidence covered a period of several years prior to the entrance of defendant into the conspiracy. It was not shown that he had any connection whatever with such acts, or any direct knowledge thereof. It was urged by defendant that he was not a party to such acts, and was prejudiced by such evidence. The admissibility of such evi-

dence against defendant was upheld. Assuming, therefore, that the question of the admissibility of this evidence was properly raised, and that the objection was in proper form, we conclude, nevertheless, that no error was committed in admitting such evidence.

Three more assignments of error are made with reference to the introduction of evidence by the prosecution. Witness Cobble testified to the receipt of a letter from his wife at the hotel at Patterson. We have fully explained that matter, and what we have said upon the evidence of theft of dynamite is applicable here. We find no error in the admission of this evidence. ▇ Witness, Marchant, a feigned accomplice, was permitted to testify to certain facts relative to his experiences while living in Seattle. This evidence was stricken out by the court at the conclusion of the trial, the court stating: "You will therefore dismiss any and all reference to this particular episode from your minds and entirely disregard all testimony relating thereto". We find no prejudicial error resulting from this incident.

▇ Lastly, it appears that at the conclusion of the trial the prosecution offered in evidence the minutes of the court to show that defendant, Buyle, who was not on trial, was represented by the same counsel who appeared for the other defendants on trial. While we are of the opinion that such evidence was not material, no showing has been made of any prejudice arising out of its admission in evidence.

▇ Prejudicial misconduct upon the part of the district attorney is next urged, and some seventeen "incidents" are set forth. The first ten relate to the conduct of the district attorney during the impanelment of the jury. Some of the prospective jurors were asked if they had any connection with the Communist party. This was proper, as it is a matter of common knowledge that the party named believes in "direct action" in the settlement of controversies, and not in judicial determinations. If this were developed, bias and prejudice might well bar the prospective jurors from serving. Other members of the panel were asked if they knew Harry Bridges. While the question might well have been omitted, we see no prejudice arising from the mere mention of the name, and the fact that Bridges is a labor leader in San Francisco according to newspaper reports. The other seven incidents occurred at the trial. The first is based on a ques-

tion asked witness, Marchant, concerning a conversation with one Scroggins. An objection was made by counsel for defendants, and some discussion took place regarding the admissibility of the evidence. The objection was overruled, and the witness answered that he had talked to defendant, Stanfield, about Scroggins, and asked him if it could be arranged so that he could ship out when this man wanted to leave San Francisco. The court finally instructed the jury to disregard the evidence. No showing is made which would justify the court in holding that this incident was prejudicial.

▇▇▇ Several assignments are based upon comments made by the district attorney, upon the failure of the defense to produce and call Buyle as a witness. It was conceded at the trial that this party was unable to attend court, on account of illness, and this fact was before the jury. We are of the opinion that Buyle was a material witness, and that his testimony would have been admissible. It is undoubtedly the rule that the district attorney may comment upon the failure of the defendant to produce material witnesses who would substantiate his story. (*People* v. *Piero,* 79 Cal. App. 357 [249 Pac. 541].) It is not misconduct for the district attorney to refer to his argument to the fact that a codefendant was not called upon to testify on behalf of the defendant. (*People* v. *Yee Foo,* 4 Cal. App. 730 [89 Pac. 450]; *People* v. *Ruef,* 14 Cal. App. 576 [114 Pac. 48, 54, 72].) Furthermore, no inference unfavorable to defendant could have been drawn by the jury, arising out of the intent to withhold or suppress evidence, for the reason that the jury knew from the record that this witness was unable to attend court due to physical disability. The assignments are without merit. It may be stated that the chief authority relied upon by appellants is *People* v. *Lee Chuck,* 78 Cal. 317 [20 Pac. 719]. In that case, however, the district attorney was commenting upon the failure to call witnesses whose evidence was "clearly incompetent".

Finally, it is urged that it was misconduct for the district attorney to comment to the effect that the defense could have called an expert witness to meet the testimony of the expert called by the People. The point has no merit whatever. ▇▇▇ Concluding this phase of the matter, we quote the fol-

lowing from *People* v. *Ruef,* cited above: "The rule requiring that the remarks of the district attorney must be wilful, not supported by the record, and must contain a statement of something as a fact, either by direct statement or innuendo, and further, that they must have been objected to, or the court's attention called to them, or else they will not be held error sufficient to reverse a case, is founded upon principles of justice and fair dealing." In *People* v. *Yee Foo,* cited above, it is stated that: "It would have to be a clear case of misconduct on the part of a district attorney to justify a reversal." Considering the assigned incidents as a whole, we do not believe that it shows a course of conduct, wilfully pursued, to injure defendants by any fair or improper means, nor do we find any such prejudice arising from such conduct as would justify a reversal.

Error is next predicated upon the order of the court denying defendant Rodger's motion for a continuance of the trial, due to his illness. This matter was entirely within the discretion of the trial court, and we see no abuse of discretion involved in the denial of the motion.

Complaint is made of the giving of several instructions. The court instructed the jury in the language of the statute, using the words, "shall be presumed *prima facie* to be guilty of a reckless and malicious possession thereof". Immediately following, the court instructed the jury that if the defendants committed certain acts (being those described in the preceding instruction) they are presumed to be guilty of the reckless and malicious possession thereof, as charged in the third count of the indictment. After retiring, the jury asked for further instructions, and both of these instructions were again given by the court. Appellants contend that the omission of the words *"prima facie"* in the second instruction was prejudicial error. An examination of text books on evidence and the codes of this state discloses that the words *"prima facie"* have never been applied to presumptions, nor have any presumptions ever been so classified. These words properly pertain to evidence, and we find *prima facie* evidence defined in section 1883 of the Code of Civil Procedure. As stated in 10 Cal. Jur., page 684: *"Prima facie* evidence, then, is presumptive in character, and, indeed, it is expressly declared by Section 1961 of the Code of Civil

Procedure that: 'A presumption (unless declared by law to be conclusive), may be controverted by other evidence, direct or indirect.' " In our opinion the words *"prima facie"* add nothing to the effect of this law, and no greater burden would be cast upon defendants if they were omitted. In view of section 1961 of the Code of Civil Procedure, when the jury was instructed that guilt was presumed, this must have been understood to be a disputable presumption. There is no difference in law between the *quantum* and character of evidence necessary to overcome a *"prima facie"* presumption than that necessary to overcome a presumption. Both are equally disputable,—unless, of course, the presumption is declared by law to be conclusive. The use of the word "presumption" in instructions, without any qualifying adjective, is the usual and accepted practice in our courts, where such presumption is rebuttable in character, and in no instances has a reversal been ordered because the jury might have understood that the presumption was *conclusive* in character. The case of *Tanaka* v. *Granelli*, 107 Cal. App. 547 [290 Pac. 515], involves such an instruction. Considering and reading these two instructions, we do not believe that the jury was misled to the prejudice of appellants.

One other instruction is questioned, where the jury were told that: "Testimony showing motive, reason or purpose is always admissible in a criminal case". We see no merit in this contention. Appellants state that the jury might believe that the court was referring to the evidence of theft of the dynamite. Conceding that this may be the fact, we have held that such evidence was admissible, and this disposes of the objection.

The following further points are urged for reversal: That the court erred in denying defendants' motion to discharge the jury; that the court erred in denying defendants' motion to exclude and suppress evidence; that the court erred in overruling the demurrer and denying motion to set aside the indictment. We do not find a sufficient showing of merit under these assignments to justify discussing them.

Concluding, we have endeavored to discuss fully every meritorious point raised, and this has resulted in a very extended opinion. Appellants were represented at the trial by able counsel, and every opportunity was given them to present

their defense. Defendant Rodger, who was in the conspiracy from its very inception, was at the trial but failed to testify. The evidence of the People was clear and apparently convincing to the jury. Defendants were afforded a fair trial, and the record shows that they were fairly convicted, and it does not appear that there was any miscarriage of justice.

The appeal from the order denying motion in arrest of judgment is dismissed.

The judgment and order denying motion for new trial are, and each of them is hereby affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 3, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 18, 1936.